BRYANT, Judge.
 

 *511
 
 Where the admission of a "rap song" was not substantially more prejudicial than probative, we overrule defendant's argument that he is entitled to a new trial. The trial court's admission of "screenshots" from an internet website was not error. The admission of opinion testimony of an expert in forensic pathology, that the victim's injuries were caused by dog bites, was not in violation of Rules 702 or 704 and did not amount to plain error.
 

 On 10 September 2012, a grand jury in Person County indicted defendant Antonio Delontay Ford on charges of involuntary manslaughter and obstruction of justice, in regard to the death of Eugene Cameron. The matter came on for trial on 23 July 2014 in Person County Superior Court, the Honorable W. Osmond Smith, III, Judge presiding.
 

 The evidence presented at trial tended to show that on 27 May 2012, at 11:00 a.m., Deputy Adam Norris, of the Person County Sheriff's Department, responded to a residence located at 1189 Semora Road in Roxboro, based on a report of a possibly deceased person. At the residence, under a carport, Deputy Norris observed the body of an adult male, later identified as Eugene Cameron, lying face up in a pool of blood. The victim's clothes had been ripped off and there were "severe lacerations to the [victim's] inner right arm and the biceps [sic] area, between that and the triceps." Most of the blood appeared to have come from lacerations to the victim's inner biceps. Also, there were paw prints in the blood pool surrounding the body. The victim had no pulse, and the body exhibited partial rigidity.
 

 Detective Michael Clark and other deputies with the Person County Sheriff's Department, also reported to the scene on 27 May 2012. Detective Clark spoke with the homeowner, John Paylor, by cell phone. When informed that the victim appeared to have been killed in a dog attack, Paylor suggested that Detective Clark look at the dog next door.
 

 *512
 
 Detective Clark and other law enforcement officers walked to the next door residence and observed a "pretty heavy" chain around a light pole in the back yard. They spoke with defendant, who acknowledged owning a dog named DMX. DMX was removed from defendant's home and turned over to Animal
 
 *101
 
 Control. Dried blood, observed on areas of DMX's body including his chest and muzzle (mouth) area, was collected and samples sent for DNA testing. DNA samples were also taken from the victim's pants, shirt, belt, and cell phone case. DNA taken from punctured cloth from the victim's pants confirmed the presence of DMX's DNA.
 

 During the course of the investigation it was revealed that DMX had been allowed to run freely in the neighborhood and that there had been at least three other dog-bite incidents involving DMX. Kennard Graves, who lived at 1253 Semora Road, testified that he was a life-long resident of Person County and that he had known defendant "all my life." Graves had been familiar with defendant's dog, DMX, for "[a]bout 6 or 7 years." Graves had five dogs of his own. Graves testified that he had observed DMX running loose in the neighborhood plenty of times, and in the month prior to Eugene Cameron's death, DMX had attacked one of Graves's dogs in Graves's backyard.
 

 Tyleik Pipkin, who was 23 years old at the time of trial, testified that on 20 October 2007, he was talking with defendant, whom he knew by the nickname "Flex." Defendant was holding his dog, but the dog got loose. Pipkin and an acquaintance ran and tried to hop on top of a car. When Pipkin fell off, defendant's dog tried to reach Pipkin's neck, and while they struggled, the dog bit Pipkin under his left bicep. Pipkin described the dog as "very aggressive." Pipkin identified the dog pictured in one of the State's exhibits (Exhibit 60) as looking like the same dog that attacked him. State's Exhibit 60 was a picture of DMX.
 

 Michael Wix was employed with the Durham County Department of Animal Control. On 20 October 2007, he responded to a 9-1-1 call reporting multiple people on Piper Street bitten by a dog. Upon arrival, Officer Wix "met [defendant] there who at the time was trying to secure DMX, who was running loose on Piper Street." Defendant identified the dog as DMX, which Officer Wix noted was a red and white male pit bull. In his report on the incident, Officer Wix wrote that defendant had let his dog loose, the dog bit two people, after which defendant was able to capture the dog. But thirty minutes later, defendant's dog was again running loose on Piper Street. Officer Wix reported that defendant appeared to be intoxicated and that when Officer Wix informed
 
 *513
 
 defendant that DMX would have to be quarantined, defendant became "very angry and aggressive."
 

 John Paylor, Jr., the homeowner of the residence located at 1189 Semora Road where Eugene Cameron's body was found, testified that he had lived at that address for twelve years. Paylor, a Vietnam veteran, who had worked with the recreations department, had been a corrections officer, and recently retired from the Department of Transportation, testified that he and Cameron had been friends "most of my life." "We came up together through school[, high school and elementary]." Cameron would usually come to Paylor's house on Saturdays after male choral practice at church. On 26 May 2012, Paylor spoke with Cameron by cell phone at 5:16 p.m. Paylor was at Myrtle Beach, and Cameron was checking on Paylor's house. Paylor testified that under his carport was a table and chairs, and that it was common for him and Cameron to sit outside in the shade. Defendant was Paylor's next door neighbor, and Paylor was familiar with defendant and defendant's dog, DMX.
 

 The night before trial began, Detective Clark discovered a webpage hosted bywww.myspace.com, with the screen name Flexugod/7.
 
 [1]
 
 On the webpage, Detective Clark observed photos of defendant and videos of defendant's dog, DMX. Detective Clark captured a "screenshot" of a video link entitled "DMX the Killer Pit." The caption associated with the video stated "After a Short Fight, he killed that mut" [sic]; the description read, "Undefeated." The videos themselves were neither admitted into evidence nor played for the jury; however, "screenshots" of the video links were admitted into evidence and published to the jury. Detective Clark testified that the "screenshots" of the dog depicted in the videos was
 
 *102
 
 the same dog seized during the investigation. Detective Clark also discovered a song "posted [online] by [defendant] Antonio Ford" about the incident under investigation, the lyrics denying that the victim's death was caused by a dog. Over defendant's objection, the song was played for the jury. Detective Clark testified that he recognized the voice on the recording as defendant's. Paylor also recognized the song played for the jury. Paylor testified that defendant often played his music loudly, and Paylor had heard that song coming from defendant's residence.
 

 The evidence also consisted of testimony from Dr. Samuel David Simmons, a forensic pathologist employed by the North Carolina Office of the Chief Medical Examiner at the time Eugene Cameron's body was autopsied. Dr. Simmons testified, without objection, to his forensic
 
 *514
 
 examination and his opinion as to cause of death. He related his initial observations of the victim's body. "[A] lot of the clothing appeared to be torn and blood soaked.... He had a pair of blue jeans which were partially pulled down his legs." As to the victim's injuries, Dr. Simmons testified that "the pattern is consistent with animal bites. These would also be consistent with dog bites as well."
 

 Q. Based upon your, um, overall examination of Mr. Cameron and the various injuries he had, do you have an opinion as to which of those injuries would have been the fatal wound or fatal injury?
 

 A. [Mr. Cameron's right upper arm] is the area of fatal injury, and again from the complexity, it's hard to tell if this was just one single bite in this particular area or multiple bites in the same area, but there were multiple perforations of his brachial artery and the vein that accompanies that artery.
 

 "The brachial artery is the main vessel that supplies blood down from your heart to your hand, essentially. So, all of the blood passes through your brachial artery." "My opinion is the cause of death is exsanguination due to dog bites."
 

 Elizabeth Wictum was admitted without objection as an expert in nonhuman forensic science and DNA analysis. Wictum, the director of the forensic unit within the Veterinary and Genetics Lab at the University of California Davis, testified that she compared the DNA profiles obtained from the punctured area of the victim's pants with a swab taken from the dog. "I got an exact match." Wictum testified that, according to her calculations, the number of times this profile comes up in the dog population is about 1 in five quadrillion.
 

 Jessica Posto, a forensic biologist working for the North Carolina State Crime Laboratory during the time of the investigation of the death of Eugene Cameron, was admitted to testify as an expert in the field of forensic science, including body fluid identification. Posto testified that she examined hair taken from the right side of the dog's belly, hair from under the dog's chest, hair from the left side of the dog's muzzle, and hair from the upper left side of the dog's neck. All four samples "revealed the presence for human blood." A forensic DNA analyst working in the biology section of the Raleigh Crime Lab testified that the DNA profile from Cameron's body matched the blood samples taken from DMX's fur.
 

 At the conclusion of the evidence, the jury returned a guilty verdict against defendant on the charge of involuntary manslaughter both on
 
 *515
 
 the basis of unlawfully allowing his dog, which was over six months old, to run at large, unaccompanied, in the nighttime, and of acting in a criminally negligent way. The jury found defendant not guilty of the charge of obstruction of justice. In accordance with the jury verdict, the trial court entered judgment against defendant on the charge of involuntary manslaughter, sentencing defendant to an active term of 15 to 27 months. Defendant appeals.
 

 _________________________
 

 On appeal, defendant raises the following issues: the trial court (I) erred in admitting a "rap" song recording; (II) erred in admitting evidence taken from the internet; and (III) committed plain error in admitting opinion testimony.
 

 I
 

 Defendant argues the trial court erred in admitting a "rap" song recording alleged to
 
 *103
 
 be defendant's. Defendant contends that the song was not relevant as it "did not have any tendency to make the existence of any fact that [was] of consequence to the determination of the action more probable or less probable" and further, was admitted in violation of Rule 403. We disagree.
 

 Pursuant to North Carolina General Statutes, section 8C-1, Rule 402, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules. Evidence which is not relevant is not admissible." N.C. Gen.Stat. § 8C-1, Rule 402 (2013). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
 
 Id.
 
 § 8C-1, Rule 401 (2013). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
 
 Id.
 
 § 8C-1, Rule 403 (2013). "[T]he term 'unfair prejudice' contemplates evidence having 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.' "
 
 State v. McDougald,
 

 336 N.C. 451
 
 , 457,
 
 444 S.E.2d 211
 
 , 214 (1994) (citation omitted) (quoting N.C.G.S. § 8C-1, Rule 403 official commentary).
 

 Whether to exclude evidence under Rule 403 is a matter within the sound discretion of the trial court. This Court
 
 *516
 
 will find an abuse of discretion only upon a showing that the trial court's ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision.
 

 State v. Jackson,
 
 --- N.C.App. ----, ----,
 
 761 S.E.2d 724
 
 , 732 (2014) (citation and brackets omitted).
 

 A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.
 

 N.C. Gen.Stat. § 15A-1443(a) (2013).
 

 Defendant moved to suppress admission of the song. However, his motion was denied, and the song was played during trial. Defendant now argues that the song, which contains profanity and racial epithets, served to offend and inflame the jury's passions and allowed them to "disregard holes in the State's case."
 

 Defendant attempts to point to the "holes in the State's case" and minimize the State's evidence by contending that the evidence presented did not inextricably tie his dog to the death of the victim. Defendant points to what was lacking in the testimony (e.g., no blood on DMX's paws, no paw prints or impressions leading to defendant's residence, and the difference between the span of the average canine bite impression on the victim's body and DMX's bite span). Other than his argument of the facts, which set forth his defense, defendant cannot show that the jury disregarded what he terms "holes in the State's case." His main argument is that admission of the song written, recorded, and published on social media and played from defendant's home to the observation of his neighbor, resulted in unfair prejudice to him.
 

 The State, on the other hand, asserts that the song was relevant and admissible to prove that the www.myspace.com page on which the song and other information was found was defendant's page (see also Issue II) and to prove, not only defendant's knowledge that his dog was vicious, but that defendant himself was proud of the viciousness of his dog. Videos posted to defendant's page onmyspace.com were titled "dmx tha killa FLEXUGOD7" and "DMX THA KILLA PIT Flexugod7."
 

 Turning our attention to the lyrics of the song, we note that while the song does contain profanity and racial epithets, it also carries a message
 
 *517
 
 consistent with defendant's claim that the victim was not killed by a dog; that defendant and DMX were scapegoats and had nothing to do with the victim's death; and that defendant's dog, having been
 
 *104
 
 held "hostage" for almost two years, should be freed.
 

 Notwithstanding the message in the lyrics as to the lack of culpability of defendant and DMX in the death of the victim-a message that supported defendant's defense, we hold defendant has failed to show the trial court abused its discretion in ruling that the evidence was relevant for the purposes stated. Further, the trial court did not err in determining that the probative value was not substantially outweighed by the prejudicial effect. While the song's use of profanity and accusatory language may have inflamed the passions of the jury, the song itself was relevant and probative, outweighing any prejudicial effect. Other relevant evidence may have done the same: For example, photos of the crime scene-showing bite marks and blood-may inflame passions, but such evidence is relevant and necessary to show not only a death but, depending on the jury's view, a death due to bite marks caused by a dog.
 

 Viewing the evidence before the jury, including prior unprovoked attacks by DMX against people and other dogs, the physical condition of Cameron's clothes and body, evidence of DNA from defendant's dog around punctures on Cameron's clothes, evidence as to cause of death-exsanguination due to dog bites, and Cameron's blood found on DMX's fur, there is no reasonable possibility that, had the song not been admitted, a different result would have been reached at trial. Defendant is unable to establish any prejudicial error. Accordingly, we overrule defendant's argument.
 

 II
 

 Next, defendant argues that the trial court erred by admitting as evidence two exhibits taken from the internet. Defendant contends that the evidence was not properly authenticated under Rule 901. Specifically, defendant contends that the trial court erred in admitting into evidence the State's proffer of two screenshots taken from a webpage hosted by www.myspace. com with only pictures of defendant and his dog and the publication of defendant's nickname for authentication. We disagree.
 

 "A trial court's determination as to whether a document has been sufficiently authenticated is reviewed de novo on appeal as a question of law."
 
 State v. Crawley,
 

 217 N.C.App. 509
 
 , 515,
 
 719 S.E.2d 632
 
 , 637 (2011) (citation omitted);
 
 see generally
 

 Phillips v. Fin. Co.,
 

 244 N.C. 220
 
 ,
 
 92 S.E.2d 766
 
 (1956) (per curiam) (holding that where documents
 
 *518
 
 are not properly identified for admission into evidence, they are properly excluded).
 

 "Any party may introduce a photograph, video tape, motion picture, X-ray or other photographic representation as substantive evidence upon laying a proper foundation and meeting other applicable evidentiary requirements." N.C. Gen.Stat. § 8-97 (2013). Pursuant to North Carolina General Statutes, section 8C-1, Rule 901 (Requirement of authentication or identification), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen.Stat. § 8C-1, Rule 901(a) (2013).
 

 Defendant cites
 
 Rankin v. Food Lion,
 

 210 N.C.App. 213
 
 ,
 
 706 S.E.2d 310
 
 (2011), in support of his argument, strongly stated on appeal, but barely raised at trial. In
 
 Rankin,
 
 the plaintiff appealed an order granting summary judgment in favor of the defendants on the plaintiff's negligence claim. Plaintiff alleged that the defendant was the owner of the store in which she was injured. To establish ownership, the plaintiff presented two documents, printouts from internet web pages. The
 
 Rankin
 
 Court held that the trial court properly excluded the two internet webpage printouts from evidence: Where plaintiff made no effort to authenticate them, they could not serve as proper evidence to challenge the defendant's motion for summary judgment.
 
 Id.
 
 at 220,
 
 706 S.E.2d at 315
 
 . The Rankin Court affirmed the trial court's grant of summary judgment.
 
 Id.
 
 at 222,
 
 706 S.E.2d at 316
 
 .
 

 Rankin
 
 is distinguishable from the instant case. In
 
 Rankin,
 
 the Court noted the plaintiff's failure to offer "any evidence tending to show what the documents in question were ... and [failure to] make any other effort to
 
 *105
 
 authenticate these documents."
 
 Id.
 
 at 219,
 
 706 S.E.2d at 315
 
 . On the other hand, in the instant case, the State presented substantial evidence, which tended to show that the website was what it was purported to be-defendant's webpage.
 

 We look to
 
 Hassan
 
 for guidance as to authentication of exhibits taken from websites. In
 
 United States v. Hassan
 
 , the Fourth Circuit Court of Appeals considered whether exhibits taken from internet websites hosted by Facebook and YouTube, submitted in the prosecution of two defendants, were properly authenticated.
 
 742 F.3d 104
 
 , 132 (4th Cir.),
 
 cert. denied sub nom.
 

 Sherifi v. United States,
 
 --- U.S. ----,
 
 134 S.Ct. 2737
 
 ,
 
 189 L.Ed.2d 774
 
 ,
 
 and cert. denied,
 
 - -- U.S. ----,
 
 135 S.Ct. 157
 
 ,
 
 190 L.Ed.2d 115
 
 (2014),
 
 and cert. denied sub nom.,
 

 *519
 

 Yaghi v. United States,
 
 --- U.S. ----,
 
 135 S.Ct. 192
 
 , 190 L.Ed. 2D 115 (2014). "the court ... required the government, pursuant to Rule 901, to prove that the Facebook pages were linked to [the defendants]."
 
 Id.
 
 at 132-33.
 

 Turning to Rule 901, subdivision (a) thereof provides that, to "establish that evidence is authentic, the proponent need only present 'evidence sufficient to support a finding that the matter in question is what the proponent claims.' "
 
 See
 

 United States v. Vidacak,
 

 553 F.3d 344
 
 , 349 (4th Cir.2009) (quoting Fed.R.Evid. 901(a) ).
 
 Importantly, "the burden to authenticate under Rule 901 is not high-only a prima facie showing is required,"
 
 and a "district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic."
 

 Id.
 

 Id.
 
 at 133 (emphasis added). The U.S. Court of Appeals for the Fourth Circuit, upheld the trial court's determination "that the prosecution had satisfied its burden under Rule 901(a) by tracking the Facebook pages and Facebook accounts to [the defendant's] mailing and email addresses via internet protocol addresses."
 
 Id.
 
 at 133.
 
 Cf.
 

 Vidacak,
 

 553 F.3d at 350
 
 ("[T]he burden of authentication is not as demanding as suggested by [the defendant]-a proponent need not establish a perfect chain of custody or documentary evidence to support their admissibility.
 
 United States v. Cardenas,
 

 864 F.2d 1528
 
 , 1531 (10th Cir.1989) ('deficiencies in the chain of custody go to the weight of the evidence, not its admissibility; once admitted, the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence.'). Indeed,
 
 the prima facie showing may be accomplished largely by offering circumstantial evidence
 
 that the documents in question are what they purport to be.
 
 See, e.g.,
 

 United States v. Dumeisi,
 

 424 F.3d 566
 
 , 575-76 (7th Cir.2005) (holding that documents of the Iraqi Intelligence Service were properly authenticated by circumstantial evidence and witness testimony);
 
 United States v. Elkins,
 

 885 F.2d 775
 
 , 785 (11th Cir.1989) ('Use of circumstantial evidence alone to authenticate a document does not constitute error.')." (emphasis added)) (citing
 
 United States v. Safavian,
 

 435 F.Supp.2d 36
 
 , 38 (D.D.C.2006) ("[t]he Court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so") in its discussion of the threshold requirements for a proffer of evidence to satisfy
 
 *520
 
 Fed.R.Evid. 901(a) );
 
 [2]
 

 see also
 

 State v. Taylor,
 

 178 N.C.App. 395
 
 , 413,
 
 632 S.E.2d 218
 
 , 230 (2006) (holding the text messages admitted were properly authenticated pursuant to Rule 901 where a telecommunications employee, who kept track of all incoming and outgoing text messages, testified that the messages were stored on the company server and accessible via the company's website with the proper access code, and the manager of a cellphone store testified that the text messages he retrieved were accessed from the telecommunication company's server with the access code for the phone the manager issued to the victim).
 

 In the instant case, the record reflects the trial court's synopsis of a meeting conducted out of the presence of the jury, during which the trial court was notified that
 
 *106
 
 the State sought to introduce evidence discovered the previous night by a law enforcement officer on a social media website. The prosecutor contended that "[t]he actual page that shows pictures of the defendant and his name, so that we can authenticate for the jury that this is his myspace page. It also includes the dog in question, DMX."
 

 Also, within the myspage page, there is a short video of DMX on a chain being called, although chained up, pulling against the chain, and also a posting of a song, which the [c]ourt has previously previewed, but talks about this case and the defendant's denial that his dog did this, but also a lot of other references, your Honor, that would fit the State's theory of the case that the defendant has a careless disregard for life and for the safety of others.
 

 In response, defendant first moved to suppress the recently discovered evidence based on the late notice, then defendant argued
 

 that with regard to authentication, simply because it has been said that this page or these pages are in my client's name, do not necessarily mean that he posted any of this material. I don't know if there has been, um, what would need to be done to trace this back to a particular IP address or whatever at this time. So, I think authentication would certainly be an issue that we would raise.
 

 *521
 
 To the extent defendant's objection was based on insufficient authentication, it was not clearly a part of his suppression motion. The trial court overruled defendant's objections reasoning that the State had stated a forecast of the foundation and a valid evidentiary purpose for the evidence and had a good faith basis to expect the evidence to be admitted at trial. The court noted further foundation would need to be provided when witnesses were called. Defendant took no exception to the trial court's ruling, and failed to raise a further objection either during direct or cross-examination of witness testimony regarding the newly discovered evidence.
 

 At trial, Detective Clark testified that while investigating this case he came across a "myspace page with the name of Flexugod/7." On that page he found photos of defendant and videos. Detective Clark testified that the dog depicted on the webpage was the dog held in custody, DMX. Detective Clark testified that during the course of his investigation he photographed a certificate awarded to defendant, on which defendant is referred to as "Flex." In the course of Detective Clark's search on www.myspace.com, he found a video posted to another social media website, www.youtube.com, depicting defendant's dog, DMX. The video was not played for the jury. Detective Clark also introduced a song that he found as a result of his internet search but did not indicate on what website the song was found. Detective Clark testified he recognized the voice in the song as that of defendant's.
 
 [3]
 
 This song is the same "rap" song we reviewed in Issue I and determined the trial court did not err in admitting the song as relevant and not unduly prejudicial.
 

 On this record, the evidence is sufficient to support a
 
 prima facie
 
 showing that the myspace webpage at issue was defendant's webpage. While tracking the webpage directly to defendant through an appropriate electronic footprint or link would provide some technological evidence, such evidence is not required in a case such as this, where strong circumstantial evidence exists that this webpage and its unique content belong to defendant.
 

 The webpage contained content unique to defendant, whose nickname was "Flex" and webpage name was "Flexugod/7": it contained pictures of defendant; pictures of his dog, DMX; it contained video captioned "DMX tha Killer Pit" and another video captioned "After a Short Fight, he killed that mut." Not only was the content distinctive
 
 *522
 
 and unique to defendant and DMX, it was directly related to the facts in issue-whether defendant had been criminally negligent in allowing his dangerous dog to attack and kill a man. Thus, the trial court did not err in
 
 *107
 
 admitting the screenshots of the webpage hosted by www.myspace.com as defendant's webpage.
 

 Further, we note for defendant and for the record that even assuming
 
 arguendo
 
 the trial court erred, given the evidence before the jury regarding prior unprovoked attacks by defendant's dog against both people and other dogs, the cause of Cameron's death, the physical condition of Cameron's clothes and body, evidence of DNA from defendant's dog found around punctures on Cameron's clothes, and Cameron's blood found on the dog's fur, there is no reasonable possibility that, had the webpage screenshots not been admitted, a different result would have been reached at the trial. Accordingly, we overrule defendant's argument.
 

 III
 

 Lastly, defendant argues that the trial court committed plain error by allowing a pathologist to opine that Cameron's death was due to dog bites. Defendant, who did not object to this testimony at trial, now contends that pathologist, Dr. Samuel Simmons, was in no better position than the jurors "to speculate that the source of the puncture wounds was specifically a dog." We disagree.
 

 In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.
 

 N.C. R.App. P. 10(a)(4) (2015). "To show plain error, a defendant must demonstrate that a fundamental error occurred at trial."
 
 State v. Brown,
 

 221 N.C.App. 383
 
 , 389,
 
 732 S.E.2d 584
 
 , 589 (2012) (citation and quotations omitted).
 

 To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.
 

 *523
 

 State v. Lawrence,
 

 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012) (citations and quotations omitted).
 

 Pursuant to North Carolina General Statutes, section 8C-1, Rule 702,
 

 [i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C. Gen.Stat. § 8C-1, Rule 702(a) (2015). Further, pursuant to Rule 702, "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."
 

 Id.
 

 § 8C-1, Rule 704.
 

 In interpreting Rule 704, this Court draws a distinction between testimony about legal standards or conclusions and factual premises. An expert may not testify regarding whether a legal standard or conclusion has been met at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the witness. Testimony about a legal conclusion based on certain facts is improper, while opinion testimony regarding underlying factual premises is allowable.
 

 State v. Trogdon,
 

 216 N.C.App. 15
 
 , 20-21,
 
 715 S.E.2d 635
 
 , 639 (2011) (citation omitted).
 

 Here, Dr. Samuel Simmons, a medical doctor, was admitted to testify as an expert in the field of forensic pathology. Prior to the trial court's ruling to admit Dr. Simmons's testimony as that of an expert, Dr. Simmons testified that "[f]orensic pathology [was] a subspecialty of pathology, and it's specifically the area that looks at things
 
 *108
 
 that causes death in the human body whether that be natural disease or some external force." As to the wounds on Cameron's body, Dr. Simmons gave the following testimony.
 

 *524
 
 Q. Dr. Simmons, you just testified that there was [sic] a number of puncture wounds and abrasions or excoriations found on Mr. Cameron at the time of the autopsy. Based upon the pattern and the nature of these items or wounds, do you have an opinion as to the source of these wounds ?
 

 A. I think overall the patter is consistent with animal bites. These would also be consistent with dog bites as well.
 

 Pictures of the wounds on Cameron's body were shown to the jury during Dr. Simmons' testimony. Dr. Simmons pointed out impressions that he interpreted as teeth impressions from canine teeth, "which are the two pointiest teeth inside a person's mouth or an animal's mouth." Dr. Simmons testified that based on his autopsy, he formed the opinion that the cause of Cameron's death was exsanguination due to dog bites.
 

 On cross-examination, Dr. Simmons was presented with a photograph of defendant's dog's mouth and teeth. Dr. Simmons testified that "in my experience and from reading about these cases, you very seldom see a case where every single bite mark looks the same regardless of whether it's one dog or multiple dogs." He could not say that all the wounds on the victim's body had been definitely caused by one animal.
 

 Nevertheless, Dr. Simmons's expert opinion on the victim's cause of death was based on his autopsy of Cameron's body, including his observation of the bite marks on the body, as well as from "[his] experience and from reading about these cases." Therefore, the admission of Dr. Simmons's opinion testimony was proper under Rule 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion," N.C.G.S. § 8C-1, Rule 702 ) and was also in accordance with Rule 704 ("[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact[,]"
 

 Id.
 

 § 8C-1, Rule 704 ). Defendant cannot establish that the admission of Dr. Simmons' testimony that Cameron's wounds were the result of dog bites amounted to plain error. Accordingly, we overrule this argument.
 

 NO ERROR; NO PLAIN ERROR.
 

 Judges DIETZ and TYSON concur.
 

 [1]
 

 In crime scene photos of defendant's residence, Detective Clark observed an award given to defendant that referred to him by the nickname "Flex."
 

 [2]
 

 N.C. Rule of Evidence 901 (N.C. Gen.Stat. § 8C-1, Rule 901 ) "is identical to Fed.R.Evid. 901 except that in example 10 [ (under subsection (b) 'Illustrations') ] the word 'statute' is inserted in lieu of the phrase 'Act of Congress or by other rules prescribed by the Supreme Court pursuant to statutory authority.' " N.C.G.S. § 8C-1, Rule 901, official commentary (2015).
 

 [3]
 

 Detective Clark interviewed defendant prior to trial and testified that he was familiar with defendant's voice.