IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-288

Filed 7 January 2026

Wake County, No. 17CR217241-910

STATE OF NORTH CAROLINA

v.

DURWARD WILSON LEGGETT III, Defendant.

Appeal by Defendant from judgments entered 7 October 2024 by Judge A. Graham Shirley in Wake County Superior Court. Heard in the Court of Appeals 14 October 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Zachary K. Dunn, for the State.*

*Gurguis Law, PA, by Nardine Mary Gurguis and Meaghan O'Connor, for Defendant.*

GRIFFIN, Judge.

Defendant Durward Wilson Leggett, III, appeals from the trial court's judgments entered after a jury found him guilty of second-degree rape. Defendant argues the trial court erred by admitting unauthenticated videos into evidence, thereby violating Defendant's right to a fair trial, and erred by placing Defendant on lifetime satellite-based monitoring. We hold the trial court did not err in admitting the videos; thus, Defendant received a fair trial. However, we hold the trial court did err by placing Defendant on lifetime satellite-based monitoring without making

required findings and reverse on that issue alone.

## I. Factual and Procedural Background

In 2007, A.T. met Defendant, and the two began a dating relationship. A.T. would stay with Defendant at his apartment and eventually moved in with him. The two then moved into a townhouse in Raleigh. A.T. testified that she and Defendant "drank often" together, but if she said she did not want to drink, "he would be irritated," "passive-aggressive and just moody," and "ill with [her]." She testified she would normally "just drink with him[,]" but at times, she felt "different than the amount of alcohol" she drank. In May 2010, the couple moved to a house in Wake Forest. During this time, Defendant worked as a salesperson at Verizon Wireless, providing him with "all of the newest" "gadgets." Among these electronics he owned was his phone and an iPad. On 27 June 2014, A.T. and Defendant got married, and A.T. testified "things started getting weird." According to A.T.'s testimony this included more arguing between her and Defendant, more passive-aggression from Defendant, and resentment and irritation toward her.

A.T. testified that approximately once a month, A.T. began to "feel different in the morning" because of what she had consumed the night before, leading her to not remember the preceding night. According to A.T.'s testimony when she asked Defendant, "What happened last night?", "he would just make faces" and say, "I don't know." A.T. testified there were times Defendant would pour her drinks, and she would "tak[e] one sip of [her] wine and wak[e] up the next day and look[] over and

see[], like, I only took one sip of that glass and just wonder[] what happened, you know." After these instances, A.T. testified she "had so many weird, like, medical things popping up left and right," including bruising and marks "that didn't make sense," scars on her leg and nose, red marks on her throat, an injured hip, and an irregular EKG.

During one incident, A.T. testified she woke up with Defendant on top of her shaking her "really violently" while she was on a couch, after which she "could see every single . . . finger in the bruise." After conversations with her mother and her friend, A.T. began to "do things differently." On 10 February 2016, Defendant went to a work event and left his iPad at their house. Because of the previous conversations with her mother and friend, A.T. testified she accidentally took a screenshot on Defendant's iPad while trying to restart it. A.T. and Defendant knew each other's passwords, and A.T. unlocked the iPad and went into the photos to delete the screenshot. A.T. testified she saw a video in which she was asleep on her couch and the iPad was recording and was pushed down "the couch cushion or chair cushion or something, because the screen goes black, but it continues to record, and you can hear" her alarm clock playing her alarm song. A.T. continued further, testifying she could hear herself "waking up, and it sounded really, really bad" like she "was moaning, and it sounded like [she] was in pain."

A.T. then opened the email app on Defendant's iPad, testifying she wanted to see if he sent the video to anyone. A.T. knew of two email addresses Defendant used,

"rorysuggs" and "willleggett," and did not see the video sent to anyone else in the email she knew about, but A.T. also noticed a second tab for another email address, "rorysuggs3," which she had never seen. A.T. opened the "rorysuggs3" email and testified the email inbox contained "graphic pictures of [her] in just really compromised positions." A.T. logged into Defendant's "rorysuggs3" email on her computer with the same password Defendant used for the other known email addresses, forwarded "as much as [she] could to [her] email," and deleted the emails she sent from Defendant's sent folder. A.T. testified she had never seen nor did she consent to what was found on Defendant's email.

Later, after Defendant returned home and was asleep, A.T. testified she logged back into "rorysuggs3" on her computer and found the videos, identified in trial as 4.3GP, 5.3GP, and 6.3GP, which depicted sexual acts, and forwarded them to herself.[1] A.T. recognized herself in the videos lying on a bed; the location of the videos as her and Defendant's townhouse in Raleigh, based on "the glare of the computer screen in [their] room relative to where the bed was that [she] was on"; and the date as what she believed to be 2009, based on when the couple lived in the townhouse. A.T. testified the hands, penis, and ejaculation in the videos were Defendant's. A.T. also testified she specifically did not know of the existence of these videos, she did not give

---

[1] These videos were included in their playable forms within a slide presentation admitted as State's Exhibit 10. The thumb drive on which the videos were uploaded was admitted as State's Exhibit 4.

consent to any of the sexual acts in the videos, she was not aware they were being recorded, and she had never been unfaithful or had sex with anyone else in her marital bed. Additionally, A.T. testified she did not alter the videos, nor did she know how to alter them, she "just forwarded the e-mails as they were."

On 11 February 2016, A.T. went to Wake Forest Police Department and met with Lieutenant Perry at approximately 7:30 or 8:00 a.m. Lt. Perry testified A.T. brought her laptop with her to the police department and pulled up the forwarded email to show Lt. Perry, after which the emails were transferred to a thumb drive by A.T. at Lt. Perry's request, which Lt. Perry kept. Lt. Perry testified she packaged the thumb drive and placed it into evidence at Wake Forest PD, accessible only by the department's evidence tech and an officer upon request and signature. Lt. Perry attempted to access the videos on the thumb drive in April 2017 but was unable to access them, causing her to send the thumb drive to the Raleigh/Wake City-County Bureau of Identification ("CCBI"). Lt. Perry testified she never saw who took the photos and videos on the laptop nor did she know what device captured those materials, and, during her meeting with A.T., A.T. claimed she was unconscious in the videos.

On 25 September 2017, Defendant was indicted on three counts of second-degree rape and one count of misdemeanor sexual battery in case no. 17CR217241. On 8 January 2024, in a superseding indictment, Defendant was indicted on three counts of second-degree rape and one count of misdemeanor sexual battery in case

no. 17CR217241, and on 9 January 2024, in a superseding indictment, Defendant was indicted on one count of second-degree forcible sexual offense in case no. 17CR217388. Prior to trial, Defendant filed a motion in limine to exclude the videos from the thumb drive, to which the trial court deferred its ruling. The trial court dismissed the misdemeanor sexual battery count.

At trial, the State called John McAuliffe, who worked in the digital evidence unit of CCBI, as an expert witness. Regarding the thumb drive containing the videos 4.3GP, 5.3GP, 6.3GP, Mr. McAuliffe testified, "the 'dot 3GP' is . . . a recording file extension for primarily mobile devices of the 3G variety, but it's not limited to 3G phones." Further, Mr. McAuliffe testified, based on the EXIF data, each video was created on 20 June 2009, but he could not determine what device recorded the videos from the data. Mr. McAuliffe initially testified videos 4.3GP, 5.3GP, and 6.3GP, were placed on the thumb drive at 3:08 a.m., 3:10 a.m., and 3:12 a.m. *UTC*, or "approximately 7:00 or 8:00 in the morning,"[2] respectively on 11 February 2016. However, he later testified the videos were uploaded to the thumb drive at 3:08 a.m., 3:10 a.m., and 3:12 a.m. *EST*, differing from A.T. and Lt. Perry's testimonies.

Mr. McAuliffe testified the last access date for videos 4.3GP and 5.3GP, when

---

[2] Mr. McAuliffe testified UTC "stands for universal time coordinate, and it basically stands for a time zone that doesn't have an offset so that computers can keep track of their time and date more easily and then transcribe it to the date and time zone of whichever one that device is in." Therefore, "the Eastern Time would be UTC minus four or five and the UTC time would be just minus zero or plus zero."

"someone plugged in the thumb drive and clicked on the video to open it," was 22 March 2016, and the envelope containing the thumb drive did not contain the 22 March 2016 date on it. Mr. McAuliffe was unable "to speak to the accuracy of [the] recording device." After the voir dire of Mr. McAuliffe, the court denied Defendant's motion in limine, finding the videos to be authenticated, to which Defendant objected.

On 25 September 2024, the jury convicted Defendant of three counts of second-degree rape and found Defendant not guilty of second-degree forcible sex offense. The trial court continued sentencing until 7 October 2024. At sentencing, the trial court sentenced Defendant to a minimum term of 44 months to a maximum term of 113 months. Also, on 7 October 2024, the State filed a request that the trial court order lifetime satellite-based monitoring ("SBM") for Defendant, which included a Static-99R risk assessment form finding Defendant to have a score of 0, classifying him as "Below Average Risk." The trial court found Defendant to require the highest possible level of supervision and monitoring because he was guilty of an aggravated offense and ordered Defendant to enroll in lifetime SBM in addition to registering as a sex offender. Defendant offered an oral notice of appeal that same day.

## II.   Analysis

Defendant argues the trial court erred by admitting unauthenticated videos thereby violating his right to a fair trial. Defendant also argues the trial court erred by placing him on lifetime SBM based solely on a Static-99 assessment that placed him in a low-risk category. We address each argument.

## A. Authentication of Videos

Defendant first argues "erroneous admission of the three videos constituting the rape charges prejudiced [Defendant], and the convictions and sentences should be vacated." Specifically, Defendant argues the videos were not properly authenticated because "no evidence was presented regarding the recording process," "no evidence was presented asserting the videos produced at trial were the same produced by the recording process," "no one testified that the videos accurately depicted what they observed," and "discrepancies in the State's theory and trial testi[]mony cast additional doubt on the videos' authenticity." We disagree.

We review Rule of Evidence 901 authentication questions de novo. *State v. Jones*, 288 N.C. App. 175, 187, 884 S.E.2d 782, 793 (2023). "Any party may introduce a photograph, video tape, motion picture, X-ray or other photographic representation as substantive evidence upon laying a proper foundation and meeting other applicable evidentiary requirements." N.C. Gen. Stat. § 8-97 (2023). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a) (2023). Rule 901 presents a non-exhaustive list which illustrates, but does not limit, various ways evidence can be authenticated in the trial court, including,

> (1) Testimony of Witness with Knowledge.--Testimony that a matter is what it is claimed to be.

. . . .

(4) Distinctive Characteristics and the Like.--Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

. . . .

(9) Process or System.--Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result

N.C. Gen. Stat. § 8C-1, Rule 901(b)(1), (4), (9).[3] "It is not error for the trial court to admit the evidence if it could reasonably determine that there was sufficient evidence to support a finding that the matter in question is what its proponent claims." *State v. Davenport*, 297 N.C. App. 605, 611, 910 S.E.2d 750, 754 (citation modified), *review denied,* 915 S.E.2d 167 (N.C. 2025). "Importantly, the burden to authenticate under Rule 901 is not high—only a prima facie showing is required." *Id.* at 611, 910 S.E.2d at 754–55 (citation modified).

Here, A.T. recognized distinctive characteristics based upon her knowledge of the people, location, and approximate time of the videos. During A.T.'s testimony she recognized herself in the videos lying on the bed, and identified the location of the videos as her and Defendant's townhouse in Raleigh based on the location of a

---

[3] "Rule 901(b)(1) complements Rule 901(b)(4), since the latter endorses what amounts to 'indirect' (or circumstantial) proof of authenticity. Read as a whole, the general language in the two provisions forms a catchall authority under which any probative evidence not otherwise excludable should be admitted to authenticate a matter, even if the proof does not fit comfortably within the more particular language of the other eight illustrations." § 9:3 Testimony of a witness with knowledge (Rule 901(b)(1)), 5 Federal Evidence § 9:3 (4th ed.).

computer in relation to the bed. She also identified the date as prior to 2010, likely 2009, based on when the couple lived in that townhouse, which corresponded with the expert's testimony that the videos were created on 20 June 2009. In addition, A.T. also recognized the hands, penis, and ejaculation in the video, testifying that they were Defendant's, to whom she had been either dating or married to for approximately nine years. Further, A.T. testified she first observed the videos on Defendant's email address, "rorysuggs3," which bore a similar name to the email of which A.T. was aware Defendant used, "rorysuggs." A.T. also accessed this previously unknown email using Defendant's password. Moreover, A.T. testified she never altered, nor did she know how to alter, the videos. Therefore, A.T.'s knowledge of various distinctive characteristics within the videos was "sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a); *see State v. Ford*, 245 N.C. App. 510, 519, 782 S.E.2d 98, 105 (2016) ("Indeed, the prima facie showing may be accomplished largely by offering circumstantial evidence that the documents in question are what they purport to be." (citation modified)).

First, Defendant argues the trial court erred in authenticating the videos at issue because of the lack of evidence presented by the State regarding the recording device or recording process, relying on *State v. Snead*, 368 N.C. 811, 814, 783 S.E.2d 733, 736 (2016), and *State v. Moore*, 254 N.C. App. 544, 565, 803 S.E.2d 196, 210 (2017). However, although a video can be authenticated via evidence regarding its recording device and recording process producing an accurate result, and the State

did not produce such evidence here, the production of such evidence is not the only avenue for authentication of a video. *Compare* Rule 901(b)(9) ("Process or System.-- Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."), *with* Rule 901(b) ("Illustrations.- -*By way of illustration only, and not by way of limitation*, the following are examples of authentication or identification conforming with the requirements of this rule[.]" (emphasis added)).

In *Snead*, our Supreme Court overturned a ruling from this Court which held a "trial court erred by admitting the video of [the] defendant shoplifting because the video was not properly authenticated" after a regional loss prevention manager testified as to the validity of surveillance footage based on a store's recording policies, recording devices, and business practices even though this manager was not at the store on the date of the theft in that case. *Snead*, 368 N.C. at 812–14, 783 S.E.2d at 735–36. In holding the video to have been properly authenticated our Supreme Court said, "'[r]ecordings such as a tape from an automatic surveillance camera *can be* authenticated as the accurate product of an automated process' under Rule 901(b)(9)." *Id.* at 814, 783 S.E.2d at 736 (emphasis added) (quoting 2 Kenneth S. Broun et al., *McCormick on Evidence* § 216, at 39–40 (7th ed. 2013)). Thus, the Supreme Court did not hold Rule 901(b)(9) to be the only way to authenticate the video; rather, the Supreme Court referred to the Rule 901(b) list as "*examples* of authentication that meet the requirements of subsection (a)." *Id.* (emphasis added). Further, the

Supreme Court noted "[g]iven that [the] defendant freely admitted that he is one of the two people seen in the video stealing shirts and that he in fact stole the shirts, he offered the trial court no reason to doubt the reliability or accuracy of the footage contained in the video" but additionally held the loss prevention manager's testimony regarding the video to be sufficient to authenticate. *Id.* at 815, 783 S.E.2d at 737.

Citing *Snead*, this Court in *Moore* reviewed an authentication of a video based solely on a copy of an officer's phone recording of a surveillance video. 254 N.C. App. at 565, 803 S.E.2d at 210. The store clerk in *Moore* "was not asked any questions about the creation of the original video or whether it accurately depicted the events that he observed on [the date of the theft]" nor was any further testimony elicited as to any distinctive characteristics. *Id.* In other words, unlike in this case, no testimony or evidence was given in *Moore* "sufficient to support a finding that the matter in question is what its proponent claims," Rule 901(a), including under the example given in Rule 901(b)(9).[4] Thus, this Court in *Moore* found error but did not limit the authentication of videos solely to the illustration in Rule 901(b)(9).

Therefore, we decline to limit authentication of videos here where Rule 901 and our Courts have not. Furthermore, Defendant's allusions to the possibility the

---

[4] "A careful review of the transcript in this case reveals that no testimony was elicited at trial concerning the type of recording equipment used to make the video, its condition on 21 May 2015, or its general reliability. No witness was asked whether the video accurately depicted events that he had observed, and no testimony was offered on the subject. We conclude that the State failed to offer a proper foundation for introduction of the video as either illustrative or substantive evidence." *Moore,* at 565, 803 S.E.2d at 210.

videos could be altered are not backed by any evidence in the record nor does Defendant make any specific claim to such effect.

In addition, Defendant argues discrepancies in the trial testimony, including the confusion regarding the time and location the videos were placed on the thumb drive and the questions surrounding the chain of custody of the thumb drive, work against authentication. However, the timing and location of when the videos were placed on the thumb drive is immaterial to the authentication of the videos themselves because, as addressed, testimony was adduced sufficient to authenticate the evidence via distinctive characteristics and from a person with knowledge.

Regarding chain of custody, our Supreme Court was clear in *Snead*,

> "A detailed chain of custody need be established only when the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been altered." [*State v. ]Campbell*, 311 N.C. [386,] 389, 317 S.E.2d [391,] 392 [1984]; [*State v. ]Kistle*, 59 N.C. App. [724,] 726, 297 S.E.2d [626,] 627 [1982] ("[T]he State need not establish a complete chain of custody [when a] witness who had inspected the film immediately after processing testified that the photographs introduced at trial were the same as those he had inspected immediately after processing."); *accord United States v. Van Sach*, No. 1:09CR03, 2009 WL 3232989, at *3 (N.D.W.Va. Oct. 1, 2009) (unpublished order) ("Establishing a formal chain of custody of evidence is no longer required [to support a finding that evidence is authentic]. Rather, it is sufficient for the party offering the [videotape] simply to satisfy the trial court that the item is what it purports to be and has not been altered." (citation omitted)). "[A]ny weak links in a chain of custody relate only to the weight to be given evidence and not to its admissibility." *Campbell*, 311 N.C. at 389, 317 S.E.2d at 392 (citations omitted).

368 N.C. at 815, 783 S.E.2d at 737. Defendant did not adduce any evidence to give reason to believe the videos were in any way altered. Thus, the potential breach in the chain of custody was applicable to the jury's weighing of the evidence and testimony from trial, not the trial court's finding the videos to be authenticated.

Therefore, the trial court did not err in finding the videos authenticated and admitting the videos.

## B. Satellite-Based Monitoring

Defendant argues the "State failed to present sufficient evidence to place [Defendant] on lifetime [SBM], and the order must be reversed without remand." We agree.

For SBM orders, we review "the trial court's findings of fact to determine whether they are supported by competent record evidence, and we review the trial court's conclusions of law for legal accuracy and to ensure that those conclusions reflect a correct application of law to the facts found." *State v. Barton*, 295 N.C. App. 182, 187, 905 S.E.2d 230, 234 (2024) (quoting *State v. Harding*, 258 N.C. App. 306, 321, 813 S.E.2d 254, 265 (2018)).

Our General Statutes prescribe when a court should impose SBM. "When an offender is convicted of a reportable conviction as defined by G.S. 14-208.6(4), during the sentencing phase, the district attorney shall present to the court any evidence . . . . [t]hat the conviction offense was an aggravated offense." N.C. Gen. Stat. § 14-

208.40A(a)(3) (2023). Then, "[a]fter receipt of the evidence from the parties, the court shall determine whether the offender's conviction places the offender in one of the categories described in G.S. 14-208.40(a), and if so, shall make a finding of fact of that determination, specifying each of the following:"

> (1) Whether the offender has been classified as a sexually violent predator pursuant to G.S. 14-208.20.
>
> (2) Whether the offender is a reoffender.
>
> (3) Whether the conviction offense was an aggravated offense.
>
> (4) Whether the conviction offense was a violation of G.S. 14-27.23 or G.S. 14-27.28.
>
> (5) Whether the offense involved the physical, mental, or sexual abuse of a minor.

N.C. Gen. Stat. § 14-208.40A(b). After which, "[t]he court shall order that the Department of Adult Correction do a risk assessment of the offender if the court finds . . . [t]he offender has committed an aggravated offense." N.C. Gen. Stat. § 14-208.40A(c)(2).

> Upon receipt of a risk assessment from the Department of Adult Correction pursuant to subsection (c) of this section, the court shall determine whether, based on the Department's risk assessment and all relevant evidence, the offender requires the highest possible level of supervision and monitoring. If the court determines that the offender does require the highest possible level of supervision and monitoring, the court shall order the offender to enroll in a satellite-based monitoring program for the life of the offender.

- 15 -

N.C. Gen. Stat. § 14-208.40A(c1).

"Moreover, 'the State must present additional evidence to support a determination that the offender requires the highest possible level of supervision and monitoring[,]' and such additional evidence cannot be as to matters already addressed in the defendant's Static-99 risk assessment, such as the defendant's underlying offense." *State v. Belfield*, 297 N.C. App. 817, 823, 911 S.E.2d 754, 759 (2025) (alteration in original) (quoting *State v. Thomas*, 225 N.C. App. 631, 633–34, 741 S.E.2d 384, 386 (2013)). "Absent a 'high risk' Static-99 score, *in addition to the State offering additional evidence*, the trial court must 'make additional findings in order to justify a maximum SBM sentence." *Id.* (citation modified) (quoting *Thomas*, 225 N.C. App. at 634, 741 S.E.2d at 387). "A trial court's order requiring SBM must be reversed, without remand, if the defendant is low risk, and 'the State presented no evidence to support findings of a higher level of risk or to support [SBM].'" *Barton*, 295 N.C. App. at 188, 905 S.E.2d at 235 (quoting *State v. Jones*, 234 N.C. App. 239, 243, 758 S.E.2d 444, 448 (2014)).

Defendant concedes second-degree rape is an aggravated offense. The risk assessment (Static-99R) came back with a nominal risk level of 0, "Below Average Risk." Thus, the State was required to present evidence to support a higher level of risk or SBM but did not. *Barton*, 295 N.C. App. at 188, 905 S.E.2d at 235.

The State argues *Barton* is distinguishable because the crime at issue in *Barton* was not an aggravated offense, 295 N.C. App. at 184, 905 S.E.2d at 232, as it

is here; however, section 14-208.40A does not maintain such a distinction for purposes of the State presenting evidence and the trial court finding additional facts.[5] Additionally, the State argues N.C. Gen. Stat. § 14-208.23 "provides for lifetime SBM for all offenders convicted of aggravated offenses," but section 14-208.23 does not determine who is or is not subject to SBM; it governs how long an individual is required to maintain his or her registration as a sexually violent predator. N.C. Gen. Stat. § 14-208.23 (2023) ("A person who is a recidivist, who is convicted of an aggravated offense, or who is classified as a sexually violent predator shall maintain registration for the person's life. Except as provided under G.S. 14-208.6C, the requirement of registration shall not be terminated."). Thus, while section 14-208.23 is applicable to Defendant based on his conviction of an aggravated offense, it is not applicable to the SBM issue.

Therefore, we must reverse the trial court's imposition of SBM.[6] *See Barton*,

---

[5] *Compare* N.C. Gen. Stat. § 14-208.40A(c1) ("Upon receipt of a risk assessment from the Department of Adult Correction pursuant to subsection (c) of this section, the court shall determine whether, based on the Department's risk assessment and all relevant evidence, the offender requires the highest possible level of supervision and monitoring. If the court determines that the offender does require the highest possible level of supervision and monitoring, the court shall order the offender to enroll in a satellite-based monitoring program for the life of the offender."), *with* N.C. Gen. Stat. § 14-208.40A(e) ("Upon receipt of a risk assessment from the Department of Adult Correction pursuant to subsection (d) of this section, the court shall determine whether, based on the Department's risk assessment and all relevant evidence, the offender requires the highest possible level of supervision and monitoring. If the court determines that the offender does require the highest possible level of supervision and monitoring, the court shall order the offender to enroll in a satellite-based monitoring program for a period of time to be specified by the court, not to exceed 50 years.").

[6] The trial court engaged with the reasonableness of SBM as to Defendant, stating during the hearing because Defendant was going to be a registered sex offender, SBM's burden or infringement on his life and liberty would be "slight" and he has a diminished expectation of privacy; because he

295 N.C. App. at 188, 905 S.E.2d at 235; *Jones,* 234 N.C. App. at 243, 758 S.E.2d at 447–48 ("This Court has previously held that a DOC risk assessment of 'moderate,' *without more,* is insufficient to support the finding that a defendant requires the highest possible level of supervision and monitoring." (emphasis in original) (quoting *State v. Green,* 211 N.C. App. 599, 601, 710 S.E.2d 292, 294 (2011)).

## III.    Conclusion

We hold there was no error in the trial court's admitting the videos at issue into evidence because the videos were properly authenticated.  However, we reverse the trial court's decision to place Defendant on lifetime satellite-based monitoring because, upon Defendant being determined to be low risk, the State failed to produce additional evidence to support findings of a higher level of risk or to support SBM.

NO ERROR IN PART; REVERSED IN PART.

Chief Judge DILLON and Judge FLOOD concur.

---

would not be on probation after being released from prison; because monitoring served the government interest of preventing society from aggravated sex offenders and deterrence of future crimes; and because sex offenders generally have a higher recidivism rate than the general population, lifetime SBM was reasonable.  However, during the same hearing the trial court stated pursuant to our Supreme Court's decision in *State v. Hilton,* 378 N.C. 692, 705, 862 S.E.2d 806, 815–16 (2021), "the highest possible level of supervision is required" because Defendant was convicted of an aggravated offense.  Consequently, the trial court's Judicial Findings and Order for Sex Offenders does not list any additional findings apart from the findings Defendant committed a sexually violent offense and was convicted of an aggravated offense.  But after *Hilton*, the General Assembly amended section 14-208.40, removing the requirement an individual convicted of an aggravated offense is automatically enrolled in SBM.  S.L. 2021-138, § 18(c).