Bucci v. Burns, 2020 NCBC 50.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 15478

MARCY BUCCI; RICK BUCCI;
EUGENE N. BUCCI; EUGENE M.
BUCCI; DAVID LUBIN; KARL
SCHULER; and LAUREL
MANDERBACH,

              Plaintiffs,

v.

ROBERT BURNS; ZEESHAN-UL-
HASSAN USMANI; and GARRETT
PERDUE,

              Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

1.    This is an action for fraud brought by individuals who invested in Predictify.me, Inc.[1] They claim that some of the company's leaders—Robert Burns, Garrett Perdue, and Zeeshan-Ul-Hassan Usmani—conspired to lure investors with false statements about its assets and business relationships. Predictify.me later went bankrupt, wiping out their investments. Discovery is now complete, and this Order addresses seven motions for summary judgment, three by Burns and four by Perdue.

> *Meynardie & Nanney, PLLC, by Robert A. Meynardie, Joseph H. Nanney, and Robert W. Weston, for Plaintiffs Marcy Bucci, Rick Bucci, Eugene N. Bucci, Eugene M. Bucci, David Lubin, Karl Schuler, and Laurel Manderbach.*
>
> *North Raleigh Law Group, by Robert Morton, for Defendant Robert Burns.*
>
> *Graebe Hanna & Sullivan, PLLC, by Douglas W. Hanna, for Defendant Garrett Perdue.*

---

[1] The Court will refer to the company as Predictify.me. It goes by many variations of the name—Predictify, Predictify.Me, and PredictifyMe—in the evidence discussed below.

*No appearance by Defendant Zeeshan-Ul-Hassan Usmani.*

Conrad, Judge.

## I.
## BACKGROUND

2.     Courts do not make findings of fact when deciding motions for summary judgment.  This background describes the evidence, noting relevant disputes, to provide context for the Court's analysis and ruling.[2]

3.     Predictify.me was a technology company in the field of predictive analytics. Its goal, never realized, was to develop applications that could predict events or outcomes in a business setting based on large sets of historical data.  (*See, e.g.*, Dep. Burns 42:3–9, ECF No. 89.1; 1st Dep. M. Bucci 52:23–53:10, ECF No. 89.15.)

4.     Failure is an orphan, so the saying goes, and there are disagreements about who was and was not a founder of Predictify.me.  It is safe to say that the idea began with Burns and Usmani.  (*See* Aff. Burns ¶¶ 4, 5, ECF No. 103.1.)  The two met in 2012.  (*See* Aff. Burns ¶ 3.)  A native of Pakistan, Usmani had developed computer code designed to predict suicide bombings and to model the impact that a bomb might have in a given location.  (*See* Aff. Burns ¶ 3; Dep. Burns 29:13–16.)  Burns saw

---

[2] With seven motions, twenty-one briefs, and dozens of exhibits at issue, the record here is sizable.  Even for simpler matters, the Business Court Rules require parties to itemize record materials in an index that "assign[s] a number or letter to each exhibit and . . . describe[s] the exhibit with sufficient detail to allow the Court to understand the exhibit's contents." BCR 7.5.  Though not often a subject of opinions, this is an important rule.  Concise, descriptive indexing of record materials improves public access and makes it easier for the Court to do its job.  Unindexed records do the opposite.  This case proves the point.  As an example, the parties labeled at least fourteen different exhibits as "Exhibit A."  (*See, e.g.*, ECF Nos. 84.1, 103.1, 108.1.)  Adding to the confusion, the briefs often cite exhibits using entirely different labels, such as the numbers assigned during depositions.  (*E.g.*, ECF No. 109 at 8 ("Dep. Exhibit 84.").)  The few briefs that include a table of exhibits do not describe their contents in any detail, making it impossible to distinguish them at a glance.

potential to adapt Usmani's work to new areas. (*See* Dep. Burns 32:9–16, 41:20–42:9, 62:11–17.) By April 2014, plans to "form[] Predictify.me as a company" were under way. (ECF No. 89.9.)

5.  Burns scouted potential advisors and board members. (*See, e.g.*, ECF No. 89.9.) He contacted Perdue, his partner in a consulting business, and Jeff Frazier, another business acquaintance. (*See* Dep. Perdue 8:1–9:19, ECF No. 89.5; Dep. Burns 66:6–15.) Both joined Burns and Usmani as directors when Predictify.me was formally incorporated in May 2014. (*See* Aff. Frazier ¶ 6, ECF No. 84.4.)

6.  Burns also contacted Marcy Bucci, a plaintiff here. Marcy's role is a focal point in this litigation, in part because she invited most of the other plaintiffs, including some family members, to invest in Predictify.me. (Four Bucci family members are plaintiffs; the Court will call them by their first names.) According to Burns and Perdue, the evidence shows that she was a central player from the start, both as an advisor and as the fifth initial director. (*See* Dep. Burns 68:19–22, 83:19–22, 85:1–19; Aff. Frazier ¶ 6; 1st Dep. M. Bucci 126:25–128:20.) Marcy denies having any serious involvement with the company's founding—she had a full-time job elsewhere—but acknowledges acting as an officer and director by October 2014 and then formally becoming president the following May. (*See* 1st Dep. M. Bucci 29:1–31:3, 128:19–20, 296:7–9.)

7.  One early question—and one that bedeviled the company ever after—was what to do with Usmani's existing products. These included TCast (for predicting attacks), BlastSim (for modeling a bomb's effect), and others. (*See* Aff. Burns ¶ 16.)

All had antiterrorism, not commercial, applications. And all were created under the banner of Go-Fig Solutions (Pvt) Ltd. ("Go-Fig"), an enigmatic entity that may have been nothing more than Usmani's alter ego. (*See, e.g.*, Aff. Burns ¶ 9; Aff. Frazier ¶ 15; 2d Dep. M. Bucci 38:6–39:23, ECF No. 89.25.) Predictify.me would need access to the underlying technology to create new products, or at least that was the plan. (Aff. Frazier ¶ 14.) Whether the company would also absorb the entire Go-Fig portfolio was an open question.

8. At first, Burns and Usmani decided against it. They told potential advisors that "co-mingling the military [antiterrorism] and commercial applications is going to be very complicated and there may not be the synergies anyway." (ECF No. 89.9.) Instead, Usmani put Go-Fig up for sale with the help of an investment banker referred to him by Perdue, (*see* ECF No. 89.10), and Burns proposed drafting an intellectual property agreement to divide rights between Predictify.me and Go-Fig, perhaps carving out a defense or antiterrorism domain for Go-Fig, (*see* ECF No. 89.12). This approach was again reiterated to advisors in June 2014 at a meeting hosted by Marcy. (*See* Aff. Frazier ¶¶ 11, 14, 15; 3d Dep. M. Bucci 63:4–11, ECF No. 97.2.)

9. Things changed in August 2014. The attempt to sell Go-Fig had stalled. (*See* Dep. Burns 136:14–137:20.) Usmani began asking whether "it makes any sense for Predictify to acquire GoFig." (ECF No. 89.17.) Responding by e-mail, Burns expressed support:

> Basically, we need to write an IP agreement from you/Go-Fig to Predictify. The challenge is figuring out how to word the IP agreement

without impacting the potential sale of Go-Fig or the fundraising of Predictify. We think the easiest thing to do is transfer all IP into Predictify, as any potentially [sic] acquirer is going to likely want some variation on the IP agreement we determine.

(ECF No. 89.17.) Predictify.me's attorney, Neil Bagchi, sent Usmani a draft agreement, which listed specific products to be assigned to Predictify.me. (*See* ECF Nos. 89.4, 89.18.)

10. A confused flurry of e-mails followed. Reversing course, Usmani objected to the potential acquisition, stating that BlastSim, TCast, and related products were "property of GoFig and ha[ve] nothing to do with Predictify." (ECF No. 89.18.) In response, Burns insisted that "we need to roll Go-Fig into Predictify," and Bagchi suggested that a product listing would help "[t]o avoid doubt with respect to the transfer of ownership." (ECF No. 89.18.) That was not acceptable to Usmani, who reiterated that "[n]o ownership is being transferred from GoFig to anyone" and questioned "why we need to sell GoFig to Predictify to start[.]" (ECF No. 89.18.) Two months later, Burns informed Bagchi that "we need to do [the intellectual property assignment] in a way where individual products are not listed." (ECF No. 89.19.)

11. The final agreement ("IP Agreement") does not list products or mention Go-Fig. (*See* Aff. Frazier Ex. B ["IP Agmt."].) It is an agreement between Usmani and Predictify.me in which he agreed to assign to the company "all worldwide right, title and interest in and to" materials or works related to predictive analytics that he "prepared, wrote, created, [or] developed." (IP Agmt. 1.) In exchange, he received 60% of Predictify.me's shares. (*See* IP Agmt. 2.) The IP Agreement was signed in

October 2014 but made effective as of that August.  (*See* Aff. Frazier ¶ 7; Aff. Burns ¶ 11.)

12.    Finalizing the IP Agreement did not lay the matter to rest.  In early November, Usmani circulated draft product sheets designed to rebrand BlastSim and TCast as Predictify.me products called SecureSim and Soothsayer.  (*See* ECF Nos. 94.3, 94.4; Aff. Burns ¶ 16; 2d Dep. M. Bucci 79:9–16.)  Even so, he expressed concern about treating BlastSim and TCast as "Predictify's property" and told Burns, Perdue, and Marcy that "we should all be clear that these products . . . belongs [sic] to GoFig." (ECF No. 89.22.)  In another e-mail to Burns, Perdue, Marcy, and Frazier the following week, Usmani stated that "[a]ll of the [Go-Fig] technology and team have shifted to Predictify anyway" and suggested "announc[ing] something like GoFig has been acquired by Predictify.me," perhaps by putting "an add [sic] . . . on the website." (ECF No. 95.2.)

13.    Within days of that e-mail, a blog post appeared on the company's website, announcing that Predictify.me "has acquired Go-Fig Solutions (Pvt) Ltd. for an undisclosed amount.  The acquisition is effective immediately and includes Go-Fig's technology and team."   (ECF No. 89.23.)   Burns admits helping to prepare the announcement.  (*See* Burns Answer ¶ 54, ECF No. 35; *see also* ECF No. 84.6 at 4–5, 11, 15.)

14.    Meanwhile, business development lagged.  Predictify.me had only a handful of clients, none with big budgets.  (*See, e.g.*, 1st Dep. M. Bucci 54:23–56:8.)  When spring came, Predictify.me made a momentary splash by announcing a collaboration

with the United Nations. The UN's own press release describes it as "a pro-bono technology contribution" in which Predictify.me would donate licenses to use SecureSim and Soothsayer for the benefit of the Safe Schools Initiative. (ECF Nos. 84.7, 89.24, 105.3.) Predictify.me expected to recover its costs, if any were incurred in implementation, but nothing more. (*See* Aff. Burns ¶¶ 45, 46; 2d Dep. M. Bucci 98:19–99:1; Aff. Frazier ¶ 28.) Even that did not happen. For reasons that are not entirely clear, the UN scrapped the project before it started. (*See* Dep. Burns 286:16–287:14.)

15. As 2015 moved along, the prospects for keeping Predictify.me afloat continued to weaken. Its flagship product, called Hourglass, was not ready for market. (*See* Aff. Buchheim ¶ 13, ECF No. 97.4.) SecureSim and Soothsayer did not generate sales to make up the difference. At the end of 2015, the company had one client, no meaningful revenue, and a dwindling reserve of cash. (*See* 1st Dep. M. Bucci 55:8–9, 86:15–24; Aff. Frazier. ¶¶ 24, 26, 27.)

16. Investors demanded a change in leadership and got it. Marcy, Burns, and Perdue left the company in December 2015. (*See* Aff. Buchheim ¶ 15.) Frazier stayed on and, prompted by investor concerns, was tasked with looking into the scope of the IP Agreement. (*See* Aff. Frazier ¶ 31; Aff. Buchheim ¶ 16.) Some executives considered whether to monetize SecureSim and Soothsayer. (*See* Aff. Buchheim ¶ 18.) Usmani pushed back, stating that both "were owned by GoFig Solutions." (ECF No. 89.26.) In January 2016, Predictify.me's chairman of the board reported to investors that there was an IP Agreement between the company and Usmani; that

"[t]here has never been an acquisition agreement between PredictifyMe and GoFig"; and that "PredictifyMe has not and does not have any intention of using any of GoFig's products or IPs." (ECF No. 89.27.)

17. With insolvency approaching, Michael Buchheim took over as CEO. He tried to raise additional funds without success. (*See* Aff. Buchheim ¶¶ 30, 31.) Buchheim resigned in April 2016, just two months after taking the job, and Predictify.me filed for bankruptcy not long after. (*See* Aff. Buchheim ¶ 36.)

18. A group of investors brought this action against Burns, Perdue, and Usmani, claiming to have been defrauded. After amendments to the pleadings and voluntary dismissals, seven plaintiffs remain: they include Marcy, her father-in-law (Eugene N.), two brothers-in-law (Rick and Gene M.), and three others who are friends of Marcy or Rick (David Lubin, Karl Schuler, and Laurel Manderbach) (together, "Plaintiffs").

19. Plaintiffs allege in their amended complaint that Burns, Perdue, and Usmani conspired to defraud them through misrepresentations about Predictify.me. Specifically, they allege that one or more defendants represented falsely that "Predictify.me had acquired Go-Fig and its proprietary technology." (Am. Compl. ¶¶ 38, 43, 50, 147, 149, 159, 160, 169, 170, 178, ECF No. 29.) Except for Eugene N., they further allege that Burns, Perdue, and Usmani falsely represented "that Predictify had entered into a formal agreement with the United Nations regarding the use of Predictify.me's predictive software." (Am. Compl. ¶¶ 148, 149, 159, 160, 169, 170, 178.) These alleged misrepresentations form the basis of claims of fraud,

negligent misrepresentation, securities violations, and unfair or deceptive trade practices.

20. Burns and Perdue contend that discovery has refuted these allegations. They argue, among other things, that the alleged misrepresentations were true; that it would have been unreasonable to rely on the misrepresentations in any event (especially for Marcy, who was a company executive); and that Predictify.me failed because Usmani's technology didn't work, not because the company had no right to use it. Perdue also insists that no misrepresentations are attributable to him and that there is no evidence that he conspired to defraud investors in Predictify.me. Usmani has not answered or otherwise made an appearance.

21. Burns and Perdue now seek summary judgment. Burns's three motions and Perdue's four are directed to different Plaintiffs. (*See* ECF Nos. 83, 85, 96, 98, 100, 102, 104.) Together, the seven motions request summary judgment on all claims. The motions have been fully briefed, and the Court held a hearing on May 1, 2019. (ECF No. 121.) The motions are ripe for decision.

## II.
## LEGAL STANDARD

22. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-mov[ant]," taking the non-movant's evidence as true and drawing inferences in

its favor. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001) (internal citation and quotation marks omitted).

23. The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). If the moving party carries this burden, the responding party "may not rest upon the mere allegations or denials of his pleading," N.C. R. Civ. P. 56(e), but must instead "come forward with specific facts establishing the presence of a genuine factual dispute for trial," *Liberty Mut. Ins.*, 356 N.C. at 579, 573 S.E.2d at 124. A "genuine issue" exists when " 'it is supported by substantial evidence,' which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion." *Id.* (quoting *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)).

III.
ANALYSIS

24. Although spread over seven motions and twenty-one briefs, the parties' arguments often overlap or repeat. The Court therefore addresses the motions together, grouping the arguments by claim.

A. Fraud and Negligent Misrepresentation

25. The parties argue the claims for fraud and negligent misrepresentation together. Fraud has five "essential elements": (a) a false representation or concealment of a material fact; (b) that was calculated to deceive; (c) that was made with intent to deceive; (d) that did in fact deceive; and (e) that resulted in damage to the injured party. *Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418

S.E.2d 648, 658 (1992). "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 484, 593 S.E.2d 595, 600 (2004) (citation and quotation marks omitted). Most of these elements are in dispute.

1. False Representations.

26.     These claims rest on two alleged misrepresentations: (1) "that Predictify.me had acquired Go-Fig and its proprietary technology" and (2) "that Predictify.me had entered into a formal relationship with the United Nations." (Am. Compl. ¶ 87; *see also, e.g.*, Am. Compl. ¶¶ 95, 98, 110, 114, 116, 121, 123.) Burns and Perdue argue that these representations, if made, weren't false.

27.     **Acquisition of Go-Fig and its proprietary technology.** Chiefly, Burns and Perdue contend that this representation was not false because "[a]ll of the technology at issue in this case was properly transferred to Predictify.me via the Usmani IP Agreement." (ECF No. 99 at 10; *see also, e.g.*, ECF No. 103 at 17.) That's debatable. The IP Agreement is between Predictify.me and Usmani in his personal capacity. It does not refer to Go-Fig or purport to transfer any intellectual property owned by Go-Fig. (*See* IP Agmt.) Indeed, Predictify.me's chairman of the board reported to investors in January 2016 that "[t]here has never been an acquisition agreement between PredictifyMe and GoFig" and that "PredictifyMe has not and does not have any intention of using any of GoFig's products or IPs." (ECF No. 89.27.)

28. Burns insists that Usmani and Go-Fig were one and the same, meaning that any assignment by Usmani was also by Go-Fig. (*See* ECF No. 103 at 17.) Many witnesses do seem to have been confused about Go-Fig. (*See, e.g.*, 1st Dep. M. Bucci 231:6–24.) Yet some evidence tends to show that Go-Fig was a legal entity incorporated in Pakistan, (*see* ECF No. 89.6), and that Usmani's wife owned part of the company, (*see* ECF No. 89.26). The record does not firmly establish that Go-Fig had no separate existence of its own.

29. Accepting for argument's sake that Go-Fig was a real entity, Perdue contends that "[t]here is no evidence that the technology in dispute was owned by Go-Fig." (ECF No. 99 at 13–15.) Not so. Usmani stated many times that BlastSim, TCast, and other things were Go-Fig's property. (*See* ECF Nos. 89.18, 89.22, 89.26.) There may be evidence pointing the other way—Bagchi, for example, claims to have been told by Usmani that all the intellectual property was his and had never been transferred to Go-Fig. (*See* Dep. Bagchi 238:15–24, 241:25–242:24, ECF No. 89.2.) But weighing the evidence is the jury's job, not the Court's.

30. Viewing the evidence in a light most favorable to Plaintiffs, the Court concludes that there are genuine issue of fact concerning the falsity of representations "that Predictify.me had acquired Go-Fig and its proprietary technology."

31. **Formal business relationship with the United Nations.** In the amended complaint, Plaintiffs allege that "Defendants' representations that Predictify.me had entered a formal business relationship with the United Nations were at all times false." (Am. Compl. ¶ 130.) Six Plaintiffs—all save Eugene N.—

allege that they relied on these false representations. (*See* Am. Compl. ¶¶ 96, 110, 114, 116, 121, 123.) It now appears that they have abandoned this allegation.

32. Burns and Perdue argue that any representations about the relationship with the UN were true. (*See, e.g.*, ECF No. 99 at 15–17; ECF No. 106 at 14–15.) They point to a press release from the UN in March 2015. There, the UN stated that Predictify.me would make "a pro-bono technology contribution" to support a pilot program aimed at safeguarding schools in developing countries. (ECF No. 84.7.) Predictify.me touted this announcement in a presentation captioned as a "Company Overview." The presentation includes a link to the UN's press release and states that "[t]he UN announced a strategic partnership with PredictifyMe" in which "PredictifyMe will provide predictive analytics for forecasting and mitigating security/terror threats to schools in at-risk regions globally." (ECF No. 99.4.) This description was not only true, Burns and Perdue contend, but also consistent with Marcy's statements at the time that the "company was featured in a partnership with the United Nations" of a "philantropic [sic]" nature. (Aff. Burns p.29.) Burns and Perdue deny misrepresenting the UN relationship as a source of profit rather than as a charitable partnership. (*See* Aff. Burns ¶¶ 44, 45; Aff. Buchheim ¶ 34.)

33. In response, Plaintiffs do not dispute any of this. (*See, e.g.*, ECF No. 108 at 14–15.) They do not argue that Predictify.me had no relationship with the UN or that representations about the nature of the relationship were false. Instead, they pivot back to the acquisition of Go-Fig: the real misrepresentation, they say, was that

"Predictify.me owned these products [that is, products acquired from Go-Fig] and was capable of providing them to the UN." (ECF No. 108 at 15.)

34. Of course, the amended complaint bases the claims for fraud and negligent misrepresentation on two false representations, one about the acquisition of Go-Fig and the other about the relationship with the UN. Having offered no argument about or evidence of the second misrepresentation, Plaintiffs have abandoned it. The Court grants the motions for summary judgment for claims of fraud and negligent misrepresentation to the extent based on a representation that "Predictify.me had entered into a formal business relationship with the United Nations."

2. Justifiable Reliance.

35. "Justifiable reliance is an essential element of both fraud and negligent misrepresentation." *Helms v. Holland,* 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996). The evidence must show not only that the plaintiff actually relied on the misrepresentation made by the defendant but also that the reliance was reasonable. "Actual reliance is demonstrated by evidence plaintiff acted or refrained from acting in a certain manner due to defendant's representations." *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 663, 464 S.E.2d 47, 57 (1995). Whether reliance was reasonable is "dependent upon the circumstances." *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 129 N.C. App. 119, 126, 498 S.E.2d 196, 201 (1998) (citation omitted).

36. Here, Plaintiffs made their investments at different times after reviewing different materials. Some claim to have reviewed information carefully before

investing.  (*See* 1st Dep. Manderbach 17:5–24, ECF No. 97.5.)  Others did not.  (*See* Dep. Lubin 55:2–3, ECF No. 84.1 ("I think you can tell that I didn't follow this investment very closely.").)  Burns and Perdue argue that the undisputed evidence does not support Plaintiffs' claims of actual or reasonable reliance.

37.  **Lubin.**  During his deposition, Lubin testified that he had never heard of Go-Fig before making his investment in Predictify.me.  (*See* Dep. Lubin 43:1–3, 66:6–8, 95:22–24, 111:17–20.)  Asked if "the words 'Go-Fig' ever cross[ed] your radar in respect to the investment," he answered "No."  (Dep. Lubin 87:14–16.)  According to Burns and Perdue, this testimony shows that Lubin did not rely on any representation that Predictify.me acquired Go-Fig and its technology.  (*See* ECF Nos. 84 at 12–15; ECF No. 86 at 9.)

38.  It was Lubin's burden, in response, to forecast evidence of actual reliance. The only thing Lubin points to is an interview that Burns and Usmani gave to CNN in early 2015.  (*See* ECF No. 89 at 16.)  In that interview, neither Burns nor Usmani mentioned Go-Fig or that Predictify.me had acquired it, and Lubin does not contend that they did.  (*See* ECF 94.2.)  Rather, Lubin argues that "Burns and Usmani stated in the interview that they would be providing [SecureSim and Soothsayer] to the UN," that he interpreted this to mean that Predictify.me owned the products, and that he relied on that representation when he invested.  (ECF No. 89 at 21.)

39.  This appears to be a new theory not alleged in the complaint.  Even if not, the record doesn't support the argument.  For one thing, the transcript of the interview does not refer to SecureSim or Soothsayer.  (*See* ECF 94.2.)  Likewise, the

passages that Lubin cites from his deposition do not show that he understood or relied on any representations about specific software or intellectual property owned by Predictify.me. (*See* Dep. Lubin 65:6–66:14.) He could not identify the technology at issue. (*See* Dep. Lubin 56:20–24 ("Q. All right. What proprietary algorithmic software programs are you talking about in your complaint, if you know? . . . A. I don't know.").) And the only representation he could recall from the CNN interview was "[j]ust that [Predictify.me] was a company that was—I believe he said working with the UN and that it was a company that could predict events." (Dep. Lubin 86:24–87:6.) At best, the testimony shows that Lubin learned from Rick—not the CNN interview—that Predictify.me was "developing" software to predict terrorist events. (Dep. Lubin 36:18–37:14.) This falls well short of actual reliance on a definite and specific representation that Predictify.me owned SecureSim and Soothsayer, much less a representation that "Predictify.me had acquired Go-Fig and its proprietary technology," as alleged in the amended complaint.

40. Lubin therefore cannot prove an essential element of his claims for fraud and negligent misrepresentation. Summary judgment is appropriate. *See Pleasant Valley Promenade*, 120 N.C. App. at 664, 464 S.E.2d at 58 (affirming directed verdict based on testimony showing absence of actual reliance); *Cabrera v. Hensley*, 2012 NCBC LEXIS 42, at \*45 (N.C. Super. Ct. July 16, 2012) (granting summary judgment when plaintiffs had not actually relied on alleged misrepresentations).

41. **Schuler.** The arguments about Schuler's reliance are similar. Burns and Perdue point to Schuler's deposition testimony. (*See* ECF No. 99 at 13; ECF No. 106

at 23.)  There, Schuler could not recall whether he had heard of Go-Fig before making his investment.  (*See* Dep. Schuler 135:8–14, ECF No. 99.3.)  Neither could he recall whether anyone represented that Predictify.me had acquired Go-Fig or planned to acquire it.  (*See* Dep. Schuler 115:3–17, 184:2–5.)

42.  In his response briefs, Schuler cites three passages from his deposition testimony to show that he reviewed Predictify.me's website, the Company Overview, and media articles before making his investment.  (*See* ECF No. 108 at 8, 9; ECF No. 111 at 9, 10.)  None shows that he relied on a representation about the acquisition of Go-Fig or its technology.  The articles, for example, are not in the record, and Schuler did not explain what they said or how he relied on them.  (*See* Dep. Schuler 159:1–11.)  Likewise, Schuler did not say what he learned from the website.  (*See* Dep. Schuler 51:3–11.)  A footnote states that the website included a blog post that announced Predictify.me's acquisition of Go-Fig, but Schuler does not argue that he saw or relied on it.  (*See* ECF No. 111 at 9 n.4.)  Asked about it at his deposition, Schuler testified "I can't honestly say that I read this—this exact blog post before I— my money changed hands."  (Dep. Schuler 182:8–15.)

43.  So too for the Company Overview.  That presentation refers to Predictify.me's relationship with the UN, as noted above, but does not mention Go-Fig.  Regardless, Schuler could not "remember reviewing" it but assumed he must have done so.  (Dep. Schuler 152:19–22.)  Even if he did review the presentation at some point, he could not recall whether he learned about the UN relationship before or after making his investment: "A. You want me to tell you the timeline when I knew

about the UN-PredictifyMe relationship. Q. In relation to the time you invested. That's all. A. Yeah. I just don't recall." (Dep. Schuler 52:3–6.)

44. In short, Schuler did not recall having any knowledge, before making his investment, of Go-Fig or of a representation that Predictify.me had acquired Go-Fig. Nor did he recall whether the acquisition of Go-Fig was an important factor in making his investment. (*See* Dep. Schuler 48:1–4 ("Q. When you made the investment, was that an important factor, that PredictifyMe was going to acquire Go-Fig? A. I don't recall the timeline.").) From this undisputed evidence, no reasonable jury could conclude that Schuler actually and reasonably relied on a representation that Predictify.me acquired Go-Fig and its technology. The Court therefore grants summary judgment in favor of Burns and Perdue on Schuler's claims for fraud and negligent misrepresentation. *See Pleasant Valley Promenade*, 120 N.C. App. at 663–64, 464 S.E.2d at 57–58; *Cabrera*, 2012 NCBC LEXIS 42, at \*45.

45. **Eugene N., Gene M., Rick, and Manderbach.** The Court considers these four Plaintiffs together because each claims to have seen a blog post in which Predictify.me announced the acquisition of Go-Fig. Burns and Perdue raise several challenges, including that some Plaintiffs didn't actually see the blog post and that, even if they did, their reliance on it was not reasonable. Having fully considered the cited evidence, the Court concludes that there are genuine issues of material fact.

46. There is ample evidence that Predictify.me's website included a blog post stating that "Predictify.me, Inc. is pleased to announce that it has acquired Go-Fig Solutions (Pvt) Ltd. for an undisclosed amount. The acquisition is effective

immediately and includes Go-Fig's technology and team." In his answer, Burns admitted that he, along with Usmani and Marcy, "prepared and caused an announcement to be posted that included" this language. (Burns Answer ¶ 54.) He reiterated as much in his answers to various interrogatories. (*See* ECF No. 84.6 at 4–5, 11, 15.)

47. Burns (but not Perdue) argues that the copy of this blog post that is in the record, located at ECF No. 89.23, is inadmissible hearsay. (*See* ECF No. 103 at 16–17.) It is not. A statement is "not hearsay in that it is offered only to show the statement was made, and not to show the truth of matters asserted in the statement." *State v. Hood*, 294 N.C. 30, 40–41, 239 S.E.2d 802, 808 (1978). He also argues that the document has not been authenticated. (*See* ECF No. 103 at 17.) This is a puzzling argument. The document at issue is the same one that was attached to interrogatories served on Burns. In his answers, he identified it as "an announcement on the blog section of the company website." (ECF No. 84.6 at 11.) All that is required for authentication is "evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. R. Evid. 901(a). Burns's own identification of the document clears that bar. *See State v. Ford*, 245 N.C. App. 510, 519, 782 S.E.2d 98, 105 (2016) (observing that burden to authenticate is not high even in context of exhibits taken from websites).[3]

48. Regardless, even if the exhibit were excluded, Burns has admitted that the blog post existed and that it announced the acquisition of Go-Fig and its technology.

---

[3] Burns makes other evidentiary arguments in his briefing. The Court has considered the objections and, in its discretion, overrules them.

Eugene N., Gene M., Rick, and Manderbach all testified to reviewing and relying on a blog post fitting that description. (*See* Dep. E.N. Bucci 37:22–38:2, ECF No. 97.1; Dep. E.M. Bucci 53:24–54:18, 87:17–89:13, ECF No. 99.1; Dep. R. Bucci 26:19–27:25, 32:22–33:1, ECF No. 99.2; 1st Dep. Manderbach 66:2–21.) Manderbach further testified that Burns made the same representation to her in a face-to-face meeting. (*See* 1st Dep. Manderbach 160:9–18, 244:15–245:5.) This is more than enough to create a genuine issue of material fact as to their actual reliance on the alleged misrepresentation.

49. The next question is whether their reliance was reasonable. Perdue argues that it was not because Eugene N., Gene M., Rick, and Manderbach "never inquired" about the acquisition of Go-Fig. (ECF No. 99 at 22–23; *see also* ECF No. 99 at 12.) Whether they could have discovered the truth with more diligence is unclear, though. Other than the blog post itself, the details of the relationship between Predictify.me and Go-Fig weren't publicly available. And Perdue does not point to evidence that these four Plaintiffs had reason to doubt the acquisition of Go-Fig or to suspect that the announcement was false. As our Court of Appeals has held, "[a] plaintiff is not barred from recovery because he had a lesser opportunity to investigate representations made by someone with superior knowledge." *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 55, 714 S.E.2d 162, 166 (2011); *see also* *Walker v. Town of Stoneville*, 211 N.C. App. 24, 34–35, 712 S.E.2d 239, 246–47 (2011) (finding question of fact when no evidence would have aroused plaintiff's suspicion and defendant had superior knowledge).

50.     Burns appears to make a different argument—that any reliance was not reasonable because some representations were received indirectly from Marcy. (*See* ECF No. 106 at 16.)  But he doesn't cite any evidence or explain the argument and therefore hasn't carried his "initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins.*, 356 N.C. at 579, 573 S.E.2d at 124.  In any event, the evidence appears to show that the announcement of the acquisition of Go-Fig came directly from Predictify.me's website, not through Marcy. (*See, e.g.*, ECF No. 99 at 12 (citing testimony).)

51.     Whether Eugene N., Gene M., Rick, and Manderbach reasonably relied on a representation that "Predictify.me acquired Go-Fig and its proprietary technology" is a question of fact for the jury.[4]

52.     **Marcy.** The facts related to Marcy's investments are rather different.  As she admits, she was not only an investor but also an officer and director of Predictify.me.  She was privy to many internal communications about the potential assignment of intellectual property by Usmani or Go-Fig that were not available to other investors.  During her deposition, Marcy testified that she relied on the announcement of the acquisition of Go-Fig and its technology but did not investigate the matter. (*See, e.g.*, 1st Dep. M. Bucci 201:3–22.)  The parties disagree about whether her reliance was reasonable in view of her role with the company and awareness of communications on the subject.

---

[4] Given that these Plaintiffs' reliance on the blog post creates a genuine issue of fact, there is no need to resolve arguments about other investor materials on which they claim to have relied.

53. Burns and Perdue contend that Marcy's reliance was not reasonable. As a "consummate insider," they argue, she was either aware of the material facts or had the ability to research and discover the truth about Go-Fig. (*See* ECF No. 101 at 19.) In response, Marcy contends that it is possible for one director of a company to defraud another and that it was reasonable for her to rely on statements made by other company officials. (ECF No. 109 at 19.)

54. It is well established that "[r]eliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011); *see also State Props., LLC v. Ray*, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002). This is usually a question for the jury. *See, e.g., State Props.*, 155 N.C. App. at 73, 574 S.E.2d at 186. Sometimes, though, "the facts are so clear that they support only one conclusion." *Id.*; *see also Thompson v. Bass*, 261 N.C. App. 285, 291, 819 S.E.2d 621, 626 (2018). Such is the case here.

55. It is undisputed that Marcy did not hear a representation that Predictify.me acquired Go-Fig or its technology before November 25, 2014, when the supposed acquisition was announced on the company's website. (*See* 3d Dep. M. Bucci 153:14–23.) In her briefing, Marcy cites discussions that occurred earlier, but she concedes that "[b]etween June and approximately November 24, [she] understood that the details of Predictify.me's acquisition of Go-Fig' [sic] intellectual property 'was work in progress' . . . ." (ECF No. 109 at 7.) The cited testimony confirms as much: "And so I knew that that was work in progress and that would be completed. And I thought

it was completed probably on or around the 24th of November, which is when the big announcement was made." (1st Dep. M. Bucci 231:2–5.) Likewise, she admitted having received notice on November 22 that no acquisition had happened. (*See* 1st Dep. M. Bucci 200:10–13 ("Q. All right. So there is no question, though, as of November 22, 2014, you were at least notified that Predictify.me had not yet acquired Go-Fig; correct? A. The cap table wasn't final. So correct.").)

56. By that point, Marcy was acting as an officer and director of the company. (*See* 1st Dep. M. Bucci 296:2–9.) It is also undisputed that she played some role, even if the extent is disputed, for months before then. Throughout that period, Marcy was aware of plans for Predictify.me to acquire intellectual property of some kind. (*See, e.g.*, 1st Dep. M. Bucci 46:17–47:5; 3d Dep. M. Bucci 69:16–70:3.) Though she did not help draft or negotiate the IP Agreement that was eventually signed, she was not excluded from that process but "opted out of that discussion because I was no value add." (3d Dep. M. Bucci 90:1–13; *see also* ECF No. 101.9 (e-mail, copying Marcy, asking whether Usmani "signed the IP assignment agreement").) At no point did Marcy ask to see the agreement. (*See* 1st Dep. M. Bucci 48:2–19.)

57. After the IP Agreement was signed, Marcy was copied on several e-mails that led to the blog post that announced an acquisition of Go-Fig. First, on November 16, 2014, Usmani asserted that BlastSim and TCast were not owned by Predictify.me:

> I was talking to Jeff and got the feeling that BlastSim and TCast (SecureSim and Soothsayer) is Predictify's property. I know I've singed [sic] the agreement to transfer the IP to make sure the investors are fine and to answer their questions, but internally we should all be clear that these products . . . belongs [sic] to GoFig. . . . I just want to be clear from day one, it would serve us all[.]

(ECF No. 89.22.) Then, about a week later, Usmani reversed course and proposed announcing "something like GoFig has been acquired by Predictify.me," suggesting that "[w]e can simply put an add [sic] on GoFig that it [has] been acquired by Predictify on the website." (ECF No. 95.2.) Usmani also proposed including a false statement in the announcement that Go-Fig "got acquired by 1 million dollar[s]"—even though "we all know there is no money involved"—as a means to "boost Predictify['s] worth . . . ." (ECF No. 95.2.)

58.   In other words, Marcy was on notice not only that Usmani disputed the ownership of assets that she now says were critical to her decision to invest but also that he proposed publishing at least one false statement about it. Yet she made no inquiry. Rather, upon seeing the acquisition announcement on the website just days later, Marcy made "an assumption that they worked out the details for [Usmani] to have felt comfortable," (1st Dep. M. Bucci 201:21–22), and "never thought to ask the details around it," (2d Dep. M. Bucci 245:14–15). There is no evidence tending to show that Marcy was prevented from investigating the company's assets; doing so simply "didn't cross [her] mind." (1st Dep. M. Bucci 138:12–25.)

59.   Taken together, the undisputed evidence shows that Marcy was on notice of Usmani's view that Predictify.me had not acquired Go-Fig and its technology and that she had heightened access to information as an officer and director, was not prevented from investigating, and made no inquiry at all. "In light of her knowledge and experience," Marcy did not exercise reasonable diligence when she assumed that Predictify.me acquired Go-Fig and its technology, and no reasonable jury could

conclude otherwise. *Thompson*, 261 N.C. App. at 291, 819 S.E.2d at 626 (affirming summary judgment); *see also Rountree v. Chowan Cty.*, 252 N.C. App. 155, 162–64, 796 S.E.2d 827, 832–33 (2017) (same). Accordingly, the Court grants the motions as to Marcy's claims for fraud and negligent misrepresentation.

3. Causation.

60. Next, Burns and Perdue contend that there is no evidence of causation. A plaintiff must prove that a false representation was a cause that "in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred . . . ." *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984). Ordinarily, causation is a question for the jury. *See Adams v. Mills*, 312 N.C. 181, 193, 322 S.E.2d 164, 172 (1984).

61. According to Burns and Perdue, Predictify.me went bankrupt because its technology didn't work, not because it failed to acquire Go-Fig. (*See, e.g.*, ECF No. 99 at 25–26.) They rely largely on affidavits from Buchheim and Frazier. Each attests that Predictify.me was freely able to use all technology associated with Go-Fig; that BlastSim and other Go-Fig technology had no commercial value; and that owning these assets would not have allowed the company to avoid bankruptcy. (*See* Aff. Buchheim ¶¶ 22, 28; Aff. Frazier ¶¶ 16, 22, 29.)

62. Plaintiffs appear to concede that Predictify.me had full access to Go-Fig's technology. (*See* 1st Dep. M. Bucci 52:2–22, 212:25–213:2.) Their theory is that Predictify.me's board wanted to monetize the Go-Fig assets (including BlastSim and

TCast) to avoid bankruptcy but could not because the company did not own them. They also contend that these assets had substantial value based on Burns's own estimates of their worth. (*See* ECF No. 108 at 21.)

63. Viewed in a light most favorable to Plaintiffs, the evidence shows that Predictify.me's executives explored monetizing BlastSim and other antiterrorism technology associated with Go-Fig. Buchheim acknowledges as much (though he denies there was any steam behind the effort). (*See* Aff. Buchheim ¶ 18.) Later, company officials told investors that there was no "acquisition agreement between PredictifyMe and GoFig" and that "PredictifyMe has not and does not have any intention of using any of GoFig's products or IPs." (ECF No. 89.27.) There is also evidence that this technology was valuable. Throughout his time with Predictify.me, Burns estimated the value of the antiterrorism technology in the millions of dollars. (*See, e.g.*, ECF Nos. 89.8, 89.9, 89.23; Dep. Burns 267:14–268:19.) No one challenged the competency of his estimates, which were presumably made as a founder and director of the company with knowledge and experience on the topic. *See, e.g.*, *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 378, 542 S.E.2d 689, 693–94 (2001).

64. The weight of this evidence is certainly up for debate. But causation is usually a jury question, and when viewed in a light most favorable to Plaintiffs, there is more than a scintilla of evidence to show that Predictify.me's failure stemmed, at least in part, from its inability to monetize valuable antiterrorism technology. That is enough to show a genuine issue of material fact.

4. Scienter.

65. Burns argues that there is no evidence that he acted with intent to deceive Plaintiffs. (*See* ECF No. 103 at 20–21.) "Whether the defendant acts with the requisite scienter for fraud is generally a question of fact for the jury." *Latta v. Rainey*, 202 N.C. App. 587, 600, 689 S.E.2d 898, 909 (2010). Intent may be shown through circumstantial evidence. *See id.* Here, there is evidence that Burns knew the IP Agreement was made between Predictify.me and Usmani, not Go-Fig, and that he worked with Usmani to prepare the blog post announcing the acquisition of Go-Fig. This is enough to create a genuine issue of material fact.

5. Conspiracy (Perdue).

66. It is undisputed that Eugene N., Gene M., Rick, and Laurel did not speak with Perdue before making their investments and that they did not rely on any representations made by him. (*See* Dep. E.N. Bucci 10:5–7; Dep. E.M. Bucci 52:15–53:1; Dep. R. Bucci 87:14–89:6; 1st Dep. Manderbach 117:3–6.) Their theory is that Perdue conspired with Burns and Usmani to defraud investors and is therefore liable for the acts of the conspiracy. (*See* ECF No. 107 at 13; ECF No. 108 at 12.)

67. The law "permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished." *Nye v. Oats*, 96 N.C. App. 343, 346–47, 385 S.E.2d 529, 531 (1989). "A threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be the showing that a conspiracy in fact existed." *Di Frega v. Pugliese*, 164 N.C. App. 499, 506, 596 S.E.2d 456, 462 (2004). "Direct evidence of a conspiracy agreement is not necessary

and often does not exist." *Pleasant Valley Promenade*, 120 N.C. App. at 657, 464 S.E.2d at 54. But the evidence must "be sufficient to create more than a suspicion or conjecture" that the alleged agreement was formed. *Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981).

68. After a thorough review, the Court concludes that the evidence of an unlawful agreement here does not rise above mere suspicion or conjecture. What Plaintiffs allege is that Burns, Perdue, and Usmani "formed an agreement as of April 13, 2014, to sell Go-Fig and its assets separately from Predictify.me, while publicly representing the acquisition of Go-Fig's assets by Predictify.me." (ECF No. 108 at 12.) The evidence shows the opposite. Throughout April and May 2014, Burns repeatedly told potential advisors and others that Usmani would sell Go-Fig in a transaction separate from the formation of Predictify.me. (*See* ECF Nos. 89.9, 89.11, 89.16.) Burns also stated that the proceeds from the sale would go to Usmani (not Predictify.me), that Go-Fig would retain rights to antiterrorism and related technologies, and that Predictify.me would obtain only those rights related to commercial markets. (*See* ECF Nos. 89.9, 89.12, 89.16.) The same message was given to Predictify.me's leadership—including Frazier and Marcy—in June 2014. (*See* Aff. Frazier ¶¶ 3, 15; 3d Dep. M. Bucci 31:10–33:10.)

69. It was not until August 2014—four months after the conspiracy allegedly arose—that Usmani began asking Burns whether "it makes any sense for Predictify to acquire GoFig." (ECF No. 89.17.) That inquiry triggered an exchange between Burns and Usmani in which the two *disagreed* about whether it would be wise for

Predictify.me to acquire Go-Fig. This discussion was not kept secret; Bagchi, the company's attorney, played an active part. Perdue's only contribution was to "defer to [Bagchi]." (ECF No. 89.17.) Far from supporting Plaintiffs' theory, these e-mails contradict the existence of any agreement.

70. Plaintiffs argue that an agreement can be inferred from Perdue's preparation of product descriptions designed to rebrand BlastSim and TCast as Predictify.me products called SecureSim and Soothsayer. But the rebranding took place seven months after the conspiracy allegedly arose and was done openly with help from others, including Marcy. It also appears that the product sheets were used to attract customers, not investors. (*See* Dep. Perdue 230:9–23, 233:19–234:5, 237:21–24, 240:5–22.)

71. Plaintiffs also argue that Perdue had a financial motive. This is speculative at best. Perdue did not draw a salary from Predictify.me, and no one has suggested that he took any part of the investments for his own use. His stock in Predictify.me lost all its value, the same as every other investor. There is evidence, as Plaintiffs note, that the consulting company jointly owned by Burns and Perdue would have received a fee from a sale of Go-Fig, at least under certain conditions, but that arrangement would hardly have given Perdue an incentive to announce publicly that Go-Fig had already been sold to Predictify.me.

72. Nothing beyond conjecture and speculation supports a theory that Perdue agreed to be part of a common scheme as of April 2014 to defraud investors in Predictify.me. Perdue is therefore entitled to summary judgment as to the claims of

fraud and negligent misrepresentation brought by all Plaintiffs. *See In re Se. Eye Ctr.—Pending Matters*, 2019 NCBC LEXIS 29, at \*129 (N.C. Super. Ct. May 7, 2019) (granting summary judgment when the record contained no evidence of conspiracy agreement); *Am. Air Filter Co. v. Price*, 2018 NCBC LEXIS 73, at \*34–35 (N.C. Super. Ct. July 10, 2018) (same); *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at \*45–46 (N.C. Super. Ct. Mar. 20, 2014), *aff'd*, 826 S.E.2d 746 (N.C. Ct. App. Mar. 19, 2019).

### B. North Carolina Securities Act

73. The North Carolina Securities Act ("NCSA") "creates private rights of action that are complementary to federal securities schemes." *Piazza v. Kirkbride*, 246 N.C. App. 576, 595, 785 S.E.2d 695, 707 (2016), *modified in part on other grounds*, 372 N.C. 137 (2019). Decisions of federal courts are therefore "persuasive authority." *Id.* at 595, 785 S.E.2d at 708.

74. Liability for securities violations may be either " 'primary' or 'secondary.' " *Id.* at 596, 785 S.E.2d at 708 (citing N.C.G.S. §§ 78A-56(a)(1)–(2), (c)). The statute creates two types of primary liability. Section 78A-56(a)(1) "sounds in fraud, comparable to common law fraud." *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC LEXIS 11, at \*29 (N.C. Super. Ct. Feb. 19, 2013), *aff'd* 820 S.E.2d 322 (N.C. Ct. App. 2018). Section 78A-56(a)(2) imposes liability for sales of a security "by means of any untrue statement of a material fact." N.C.G.S. § 78A-56(a)(2). Both sections are understood as antifraud provisions, and both restrict primary liability to "one who sells or offers for sale a security." *Highwoods Realty*, 2013 NCBC LEXIS 11, at \*29, 33. "If primary liability exists" for

a given securities transaction, then individuals who " 'materially aided' in the transaction" may be subject to secondary liability. *Id*. at *29 (quoting N.C.G.S. § 78A-56(c)).

75. Plaintiffs allege that Burns and Perdue are primarily liable under sections 78A-56(a)(1) and (2) and secondarily liable under section 78A-56(c). These claims are based on the same facts that underlie their claims for fraud and negligent misrepresentation. Specifically, Plaintiffs allege that Burns and Perdue offered or sold securities based on false representations that Predictify.me acquired Go-Fig and its proprietary technology and that Predictify.me entered into a formal business relationship with the United Nations. As noted above, though, Plaintiffs have abandoned the latter allegation.

1. Claims Against Perdue.

76. Perdue argues that all claims against him under the NCSA must be dismissed. (*See, e.g.*, ECF No. 97 at 17–18.) The Court agrees.

77. Our courts "place great emphasis on the solicitation of the buyer as the most critical stage of the selling transaction in determining who is an offeror or seller of securities." *Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *23 (N.C. Super. Ct. Feb. 27, 2015) (citation, alteration, and quotation marks omitted). Usually, solicitation requires direct communication "at a minimum." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003). Here, it is undisputed that Perdue had only minimal contact with any Plaintiff other than Marcy and, in any event, did not solicit any of their

investments.  (*See, e.g.*, 1st Dep. M. Bucci 259:7–14; Dep. R. Bucci 87:14–20; Dep. Schuler 126:5–10; 1st Dep. Manderbach 218:4–6.)

78.    Plaintiffs argue that "Perdue was sufficiently involved in the solicitation of sales" that the transactions should be attributable to him.  (*E.g.*, ECF No. 109 at 22.) They cite decisions of some federal courts stating that a defendant may be primarily liable when "he exerts such control over another's solicitation that those efforts are 'directly attributable to' the defendant."  *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1063 (D. Minn. 2003) (citing *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988)).  But Plaintiffs do not point to any evidence that Perdue exercised control over solicitation by others.  Even under Plaintiffs' theory, no reasonable jury could find that Perdue was an offeror or seller of securities.

79.    The claims for secondary liability rest solely on the alleged conspiracy between Burns, Usmani, and Perdue.  (*See* ECF No. 89 at 27–28; ECF No. 107 at 21; ECF No. 108 at 19–20; ECF No. 109 at 22.)  As discussed, evidence of this alleged conspiracy does not rise above mere suspicion and conjecture.  Thus, it cannot support claims for secondary liability.[5]

80.    Even taking the evidence in a light most favorable to Plaintiffs, no reasonable jury could find Perdue liable for violations of the NCSA.  Summary judgment is appropriate.

---

[5] It bears noting that Plaintiffs again point to Perdue's revision of product descriptions for Soothsayer and SecureSim.  (*See, e.g.*, ECF No. 108 at 19.)  These product descriptions were used to solicit customers, not investors.  (*See* Dep. Perdue 230:9–23, 233:19–234:5, 237:21–24, 240:5–22.)

2. Claims Against Burns.

81. The dismissal of the claims against Perdue also resolves any secondary liability claims against Burns. There can be no secondary liability without a viable claim for primary liability. The Court therefore grants summary judgment in favor of Burns on that issue as to all Plaintiffs.

82. Burns also presses several arguments for summary judgment as to the claims of primary liability. (*See* ECF No. 86 at 19–21; ECF No. 103 at 23–25; ECF No. 106 at 17–18.) The Court addresses his arguments as to Marcy's claims before turning to those related to the other Plaintiffs' claims.

83. **Marcy.** Justifiable reliance is an essential element of any claim under section 78A-56(a)(1). *See Piazza*, 246 N.C. App. at 598, 785 S.E.2d at 709. As discussed above, the undisputed evidence shows that Marcy did not justifiably rely on any representation that Predictify.me had acquired Go-Fig. Thus, Marcy cannot prevail on her claim under section 78A-56(a)(1).

84. Burns also contends that he may not be held primarily liable under section 78A-56(a)(2) because the alleged misrepresentation was not of a "material fact." (ECF No. 103 at 23–24.) Materiality is an objective inquiry: is there a substantial likelihood that disclosure of the truth would have caused a reasonable investor to change the decision to purchase the security? *See, e.g., Gasner v. Bd. of Supervisors*, 103 F.3d 351, 356 (4th Cir. 1996). Put another way, would a reasonable investor have viewed the disclosure as significantly altering the total mix of information available, given the subject matter and the relationship of the parties? *See id.*; *see also Basic Inc. v.*

*Levinson*, 485 U.S. 224, 231–32 (1988); *Gilbert v. Nixon*, 429 F.2d 348, 356 (10th Cir. 1970). Burns argues that the answer is no because the total mix of information available to Marcy included Usmani's statements that Predictify.me had not acquired Go-Fig and its technology.

85.     Marcy offers no response to this argument. (*See* ECF No. 110 at 20–22.) As discussed, the mix of information available to her was far different from that available to an average investor. She served as an officer and director of Predictify.me and had access to information that was not publicly available, including knowledge that there had been no acquisition of Go-Fig as of November 22, 2014. (*See, e.g.*, 1st Dep. M. Bucci 200:10–13, 296:3–9.) The IP Agreement was also available to her—even if she never asked to see it. (*See, e.g.*, 1st Dep. M. Bucci 48:2–19; 3d Dep. M. Bucci 90:1–13; ECF No. 101.9.) And, of course, she received e-mails in which Usmani first denied that Predictify.me had acquired Go-Fig and later proposed announcing that there had been an acquisition. (*See* ECF Nos. 89.22, 95.2.) The facts—and the warning signs—were available to Marcy. Even viewing this evidence in her favor, the Court concludes that a reasonable investor would not have viewed the disclosure of the truth as significantly altering the total mix of information available. *See Gasner*, 103 F.3d at 360 (affirming summary judgment when "the total mix of the information made available warned [investors] of the high risks they were facing" yet they "nonetheless chose to purchase" investments).

86.     The Court therefore grants summary judgment in favor of Burns as to Marcy's claims for primary liability under sections 78A-56(a)(1) and (2).

87. **All other Plaintiffs.** For each of the other Plaintiffs, Burns argues that he is not an offeror or seller of securities as required to impose primary liability under section 78A-56(a). (*See, e.g.*, ECF No. 106 at 17–18.) According to Burns, he did not solicit investments from Plaintiffs.

88. Solicitation usually requires evidence of direct communication with an investor. *Rosenzweig*, 332 F.3d at 871; *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir. 1996) (Alito, J.); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009). The only one who claims any direct contact with or solicitation by Burns is Manderbach, who testified that Burns directly solicited her investment in April 2015. (*See* 1st Dep. Manderbach 160:9–18, 205:9–17, 266:4–8.) A week later, Manderbach purchased a convertible note. (*See* 1st Dep. Manderbach 16:11–17:24.) This is enough to create a question of fact.

89. The others, however, deny having any contact with Burns. Schuler could not recall receiving any communication from Burns before making his investment. (*See* Dep. Schuler 38:19–22.) Rick admitted that "I did not have contact with Rob Burns or Garrett Perdue prior to my investment." (Dep. R. Bucci 89:5–6.) Likewise, Eugene N., Gene M., and Lubin denied receiving any direct communications from Burns. (*See* Dep. E.N. Bucci 10:8–10; Dep. E.M. Bucci 274:22–275:6; Dep. Lubin 92:14–17.)

90. Plaintiffs contend that Burns was "sufficiently involved" to be deemed a seller because he participated in the preparation of investor materials. (ECF No. 111 at 18.) As the United States Supreme Court has stressed, though, primary liability

will not be imposed upon "participants collateral to the offer or sale." *Pinter v. Dahl*, 486 U.S. 622, 650 (1988); *see also Piazza*, 246 N.C. App. at 602–03, 785 S.E.2d at 711–12 (applying *Pinter*). Courts have refused to treat an individual as an offeror or seller based on preparation of marketing materials without active, direct solicitation of investors. *See, e.g.*, *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 522–23 (S.D.N.Y. 2016).

91.  Plaintiffs also argue that Burns exerted control over the solicitation so "that those efforts are 'directly attributable to' [him]." *Stephenson*, 282 F. Supp. 2d at 1063 (quoting *Capri*, 856 F.2d at 478); *see also Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 582 (S.D.N.Y. 1995) ("[S]olicitation requires direct and personal contact, or control over and direction of the person who makes the direct solicitation."). Again, though, Plaintiffs do not cite any evidence of control. It is undisputed that Marcy solicited investments from Eugene N., Gene M., Rick, and Schuler, and that Rick solicited an investment from Lubin. (*See* Dep. E.N. Bucci 8:11–20; Dep. E.M. Bucci 11:12–13:10; Dep. R. Bucci 15:25–18:7; Dep. Schuler 12:19–14:17; *see also* 1st Dep. M. Bucci 158:3–25.) Plaintiffs do not point to any evidence suggesting that Marcy or Rick acted under the control of Burns.

92.  As a result, no reasonable jury could find Burns primarily liable for the solicitation of investments from Eugene N., Gene M., Rick, Schuler, and Lubin. The Court grants the motions for summary judgment as to these claims.

93.  That leaves Manderbach's claim. Although Burns makes several other arguments in favor of summary judgment, none is persuasive. He reiterates, for

example, his arguments related to scienter, justifiable reliance,[6] and causation. For the reasons discussed above, genuine issues of fact require the denial of summary judgment.

94. Burns also invokes an affirmative defense provided under section 78A-56(a)(2). He claims that he did not know, and could not have known, that representations about the acquisition of Go-Fig were false or misleading. (*See* ECF No. 103 at 25.) Burns was an officer and director, intimately involved in drafting the IP Agreement, and well aware of Usmani's claims that Predictify.me had not acquired Go-Fig and its technology. (*See, e.g.*, Aff. Burns ¶¶ 6–8, 10–13; Dep. Burns 69:12–21, 146:8–147:16.) His knowledge of the truth or falsity of the announcement is a question for the jury.

95. Finally, Burns makes arguments that any misrepresentation was not made "in connection with" the sale of securities, under section 78A-56(a)(1), and that any sale was not made "by means of" an untrue statement, under section 78A-56(a)(2). Likewise, he contends that the misrepresentation was not of a material fact as required by both sections. Each argument depends on the circumstances of the investment (for example, the total mix of information available to the investor). Here, Burns incorporates arguments from his brief related to Marcy's claims, which turned on the facts surrounding her investments. (*See* ECF No. 106 at 17.) He does not point to any evidence related to the investment by Manderbach. Accordingly, Burns

---

[6] Lubin and Schuler did not reasonably rely on any representation that Predictify.me had acquired Go-Fig and, thus, cannot maintain a claim for primary liability under section 78A-56(a)(1) for that reason as well.

has not carried his "initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins.*, 356 N.C. at 579, 573 S.E.2d at 124.

96. For these reasons, the Court concludes that Manderbach's claim for primary liability under section 78A-56(a) may proceed and therefore denies Burns's motion as to that claim. The Court enters summary judgment in favor of Burns as to the primary liability claims of Eugene N., Gene M., Rick, Lubin, and Schuler.

## C. Unfair or Deceptive Trade Practices

97. To succeed under section 75-1.1, a plaintiff must show that the defendant committed an unfair or deceptive act, that the act was in or affecting commerce, and that it proximately caused the plaintiff's injury. *See Capital Res., LLC v. Chelda, Inc.*, 223 N.C. App. 227, 239, 735 S.E.2d 203, 212 (2012). Burns and Perdue argue that the statute does not apply to the securities transactions at issue because transactions of that kind are not "in or affecting commerce."

98. As the Court noted in an earlier decision, the law in this area is clear. "Although [the] statutory definition of commerce is expansive," it does not include "securities transactions," which are extraordinary events that fall outside the statute's purview. *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593, 403 S.E.2d 483, 492 (1991). "Our legislature did not intend for section 75-1.1, 'with its treble damages provision, to apply to securities transactions which were already subject to pervasive and intricate regulation' under state and federal statutes." *Bucci v. Burns*, 2018 NCBC LEXIS 37, at *25–26 (N.C. Super. Ct. Apr. 25, 2018) (quoting *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985)). For

that reason, the Court dismissed section 75-1.1 claims by some Plaintiffs, including Marcy and Eugene N., who had purchased stock of Predictify.me. *See id.* at \*26.

99. The claims of Gene M., Rick, Schuler, Manderbach, and Lubin remain. Each purchased a convertible note, rather than stock. In the earlier decision, the Court noted that "[i]t appears likely that the purchases of convertible notes are also securities transactions" but elected not to dismiss the claim because the pleadings did not give enough detail about the nature of the notes. *Id.* at \*26–27.

100. Discovery has clarified that each of these Plaintiffs purchased a note convertible to stock. "Promissory notes that are convertible into stock . . . are securities . . . ." *Piazza*, 246 N.C. App. at 596 n.5, 785 S.E.2d at 708 n.5; *see also* N.C.G.S. § 78A-2(11) (defining a security under the NCSA as "any note"). Indeed, in their response brief, these Plaintiffs concede that the allegedly wrongful conduct "occurred in furtherance of a securities transaction." (*E.g.*, ECF No. 111 at 20.) As a result, the purchases at issue are securities transactions that fall outside section 75-1.1 as a matter of law. *See, e.g.*, *HAJMM*, 328 N.C. at 593, 403 S.E.2d at 492; *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 62, 554 S.E.2d 840, 848 (2001).

101. Plaintiffs contend that the section 75-1.1 claim should not be dismissed because it has been asserted in the alternative to their claims under the NCSA. In other words, they argue that Burns and Perdue should be liable under section 75-1.1 if they are not liable as offerors or sellers under the NCSA. (*See, e.g.*, ECF No. 111 at 20.) The Court disagrees. Our appellate courts have held that "securities transactions are beyond the scope of N.C.G.S. § 75-1.1." *Skinner*, 314 N.C. at 275,

333 S.E.2d at 241. The statute is not designed to fill perceived gaps in the securities laws. The transactions at issue are securities transactions and therefore fall outside the purview of section 75-1.1 regardless of whether Burns and Perdue are offerors or sellers under the NCSA.

102. The Court grants summary judgment in favor of Burns and Perdue as to the remaining claims under section 75-1.1.[7]

### D. Punitive Damages

103. Burns argues that he is entitled to summary judgment on the issue of punitive damages. There is no standalone claim for punitive damages; thus, any request for that remedy by Marcy, Lubin, and Schuler is mooted by the dismissal of their claims.

104. As to the four Plaintiffs with live claims, Burns argues that the request for punitive damages depends on a finding that Burns is vicariously liable for Usmani's actions and that vicarious liability cannot support an award of punitive damages in North Carolina. *See Vandevender v. Blue Ridge of Raleigh, LLC*, 901 F.3d 231, 237 (4th Cir. 2018). The Court does not agree. The fraud claims rest on Burns's own statements and actions, not on a theory of vicarious liability. Accordingly, the Court denies the request for summary judgment as to the remedy of punitive damages. *See Collier v. Bryant*, 216 N.C. App. 419, 436, 719 S.E.2d 70, 83 (2011) ("Plaintiffs

---

[7] Perdue urges the Court to award attorneys' fees. (*See* ECF No. 99 at 10.) By statute, attorneys' fees may be awarded when "[t]he party instituting the action knew, or should have known, the action was frivolous and malicious." N.C.G.S. § 75-16.1. The Court will not make that determination on the limited briefing devoted to the issue. Burns and Perdue are free to renew the request in a formal motion for attorneys' fees with appropriate support and briefing, allowing for a full and complete response from Plaintiffs.

presented sufficient evidence to create a genuine issue of material fact as to . . . actual fraud and may therefore seek punitive damages . . . .").

## IV.
## CONCLUSION

105. For these reasons, the Court **GRANTS** Perdue's motions for summary judgment. All claims against Perdue are dismissed with prejudice.

106. The Court **GRANTS** Burns's motion for summary judgment as to David Lubin and his motion for summary judgment as to Marcy Bucci. All claims asserted by Lubin and Marcy against Burns are dismissed with prejudice.

107. The Court **GRANTS** in part and **DENIES** in part Burns's motion for summary judgment as to Eugene N. Bucci, Gene M. Bucci, Rick Bucci, Karl Schuler, and Laurel Manderbach as follows:

a. The Court **GRANTS** the motion as to all claims brought by Schuler. These claims are dismissed with prejudice.

b. The Court **GRANTS** the motion as to all claims for violations of section 78A-56(c)(1)–(2) and section 75-1.1. These claims are dismissed with prejudice.

c. The Court **GRANTS** the motion as to all claims for violations of section 78A-56(a)(1)–(2) by Eugene N., Gene M., and Rick. These claims are dismissed with prejudice.

d. The Court **DENIES** the motion as to the claims for fraud and negligent misrepresentation by Eugene N., Gene M., Rick, and Manderbach and as to the claim for violations of section 78A-56(a)(1)–(2) by Manderbach.

**SO ORDERED**, this the 30th day of June, 2020.

        /s/ Adam M. Conrad
        Adam M. Conrad
        Special Superior Court Judge
         for Complex Business Cases